Carol O'CONNOR, Plaintiff–Appellant,

v.

R.F. LAFFERTY & COMPANY, INC.; and Roy A. Foulke, Defendants–Appellees.

No. 90–1371.

United States Court of Appeals, Tenth Circuit.

May 28, 1992.

Alan C. Friedberg (Patricia A. Motz with him on the briefs) of Pendleton & Sabian, P.C., Denver, Colo., for plaintiff-appellant.

Richard H. Goldberg (David H. Wollins and Michael A. Zahorik with him on the brief) of Brenman Raskin Friedlob & Tenenbaum, P.C., Denver, Colo., for defendants-appellees.

Before BRORBY and McWILLIAMS, Circuit Judges, and ALLEY,* District Judge.

BRORBY, Circuit Judge.

Plaintiff appeals the district court's grant of summary judgment disposing of her federal and state securities law claims. She also appeals the district court's decision to submit her remaining state law tort claims to arbitration. We affirm in part, and reverse in part.

---

\* The Honorable Wayne E. Alley, United States District Judge for the Western District of Okla-

## I.  FACTS

In 1975, Carol M. O'Connor received a $200,000 property settlement from her divorce. She deposited this entire sum into an account with the investment firm of R.F. Lafferty & Company, Inc., to be handled by Roy Foulke. Ms. O'Connor's brother recommended Mr. Foulke who was a family friend and who had previously handled accounts for other members of Ms. O'Connor's family.

Ms. O'Connor gave Mr. Foulke and Lafferty complete discretion to handle her account. Mr. Foulke knew Ms. O'Connor was not an experienced investor. In fact, prior to her association with Lafferty she had only invested in a savings account. Her husband or her father had always handled her finances. Ms. O'Connor informed Mr. Foulke the money she deposited represented virtually all of her assets. Ms. O'Connor also instructed Mr. Foulke she would need to rely on the $700 income generated from her deposit and the $800 maintenance payments from her ex-husband to meet her monthly living expenses. Ms. O'Connor also expected her account to generate sufficient income to cover the taxes on her alimony and on the account, the fees of her accountant and the servicing fees for her account. Mr. Foulke knew Ms. O'Connor relied on him to make all decisions concerning her securities account. Consequently, Mr. Foulke traded on Ms. O'Connor's account and notified her of the trading activity by sending a trade ticket within thirty-six hours and again at the end of the month in her statement.

In 1985, because of the success in Ms. O'Connor's investment account, her husband was relieved of his alimony obligation. Understandably, this event changed the nature of her financial plan. From that point, Ms. O'Connor's account would have to generate $2,100 a month.

Ms. O'Connor first became concerned about the value of her account in February 1987. Ms. O'Connor contends that from

homa, sitting by designation.

1982 through 1987 Mr. Foulke and Lafferty purchased several securities unsuitable for her investment objectives. Specifically, Ms. O'Connor objects to investments in oil and gas limited partnerships; units of stock and warrants in Patient Medical Systems Corporation; units of International Surgical and Pharmaceutical Corporation securities; units in Job Stores, Inc. securities; units in R.T. Acquisition Corporation securities; and units of Kerkoff Industries, Inc. securities. Ms. O'Connor requested a judgment for actual damages of $329,000 plus a reasonable rate of return on amounts unsuitably invested that earned no income.

In 1988, Ms. O'Connor directed Mr. Foulke to stop all trading on her account. She brought suit against Mr. Foulke and against Lafferty for the acts of Mr. Foulke as a controlling person and under the doctrine of respondeat superior asserting seven claims: (1) violation of § 10(b) of the 1934 Securities Exchange Act and Rule 10b–5 promulgated thereunder; (2) breach of a fiduciary duty; (3) negligent failure to supervise; (4) professional negligence; (5) common law fraud; (6) intentional infliction of emotional distress; and (7) violations of Colo.Rev.Stat. §§ 11–51–123 and 11–51–125(2), (3) and (5).[1]

The district court granted Defendants' motion for summary judgment as to count one and subsequently dismissed counts five and seven. The court submitted the remaining state law claims to arbitration. The court later adopted the arbitrator's award of $30,000 in favor of Ms. O'Connor.

Ms. O'Connor appeals all the district court's rulings. She asserts the district court erred in (1) granting summary judgment on her § 10(b) and Rule 10b–5 claim; (2) dismissing her claim for common law fraud; (3) dismissing her state securities claims; (4) compelling arbitration of her remaining state law claims; and (5) failing to award her attorneys' fees.[2]

## II.  ANALYSIS

### A.  Unsuitability

The district court granted Defendants' motion for summary judgment against Ms. O'Connor's § 10(b) and Rule 10b–5 claim. The court found the Defendants did not possess the requisite scienter or intent to defraud to sustain such a claim. The court also found that although the Defendants did invest in securities unsuitable for Ms. O'Connor's investment objectives, Ms. O'Connor could not demonstrate her justifiable reliance on the purchases where she had information the securities may be unsuitable and acted recklessly by failing to investigate. The court found persuasive deposition testimony by Ms. O'Connor where she admitted Mr. Foulke did not intend to defraud or hurt her. She further testified he did not willfully withhold information or lie to her. *O'Connor v. R.F. Lafferty & Co., Inc.*, No. 89–F–55 (D.Colo. Nov. 7, 1989).)

Ms. O'Connor asserts several errors by the district court. She claims the court did not understand the nature of the allegations; facts existed to establish the requisite scienter; the court erred by relying on Ms. O'Connor's non expert opinion testimony; and Ms. O'Connor's reliance was justified or in the alternative, reliance need not be shown.

We review the district court's grant of summary judgment de novo applying Federal Rule of Civil Procedure 56(c). *Applied Genetics Int'l, Inc. v. First Affiliated Sec., Inc.*, 912 F.2d 1238, 1241 (10th Cir.1990). Summary judgment is appropriate where no issue of material fact remains and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c); *Russillo v. Scarborough*, 935 F.2d 1167, 1170 (10th Cir.1991).

Section 10(b) of the 1934 Securities Exchange Act makes it unlawful for any person, in connection with the purchase or sale of a security, to use or employ any manipulative or deceptive device in contravention

1.  These are the state analogues to the 1934 Securities Exchange Act, § 10(b) and the Securities Act of 1933, § 12(2).

2.  Defendants assert a statute of limitations defense which we do not address as it is not properly before us.

of the rules and regulations prescribed by the Commission. 15 U.S.C. § 78j(b). Pursuant to its rule-making authority, the Commission prescribed Rule 10b–5 which makes it unlawful for any person, in connection with the purchase or sale of a security

(a) To employ any device, scheme, or artifice to defraud,

(b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or

(c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person.

17 C.F.R. § 240.10b–5 (1990).

"As a general matter, however, private § 10(b)/Rule 10b–5 damage claims can be said to require: 1) the use of jurisdictional means 2) to implement a deceptive or manipulative practice (with the requisite scienter) 3) in connection with 4) the purchase or sale 5) of a security 6) causing 7) damages."

*Craighead v. E.F. Hutton & Co., Inc.,* 899 F.2d 485, 493 (6th Cir.1990) (quoting *Wilsmann v. Upjohn Co.,* 775 F.2d 713, 719 (6th Cir.1985), *cert. denied,* 476 U.S. 1171, 106 S.Ct. 2893, 90 L.Ed.2d 980 (1986)).

■ Ms. O'Connor claims Defendants bought securities which were unsuitable for her investment needs. Federal courts recognize such a claim as a violation of § 10(b) and Rule 10b–5. *Clark v. John Lamula Investors, Inc.,* 583 F.2d 594, 599–600 (2d Cir.1978).

The unsuitability doctrine is premised on New York Stock Exchange Rule 405—Know Your Customer Rule[3] and the National Association of Securities Dealers Rules of Fair Practice.[4] *In Re Trujillo,* 1987 SEC LEXIS 1978, at *60–61 (April 23, 1987); Mark C. Jensen, *Abuse of Discretion Claims Under Rule 10b–5: Churning, Unsuitability, and Unauthorized Transaction,* 18 Sec.Reg.L.J. 374, 380 (1991).[5] Unsuitability claims can be analyzed as omission cases or fraudulent practices cases. *See City of San Jose v. Paine, Webber, Jackson & Curtis Inc.,* No. C 84–20601 RFP, 1991 WL 352485, *1, 1991 U.S.Dist. LEXIS 8318, at *1 (N.D.Ca. June 6, 1991); *Trujillo,* at *61.

Some courts examining a § 10(b), Rule 10b–5 unsuitability claim have analyzed it simply as a misrepresentation or failure to disclose a material fact. *See, e.g., Lefkowitz v. Smith Barney, Harris Upham & Co., Inc.,* 804 F.2d 154, 155 (1st Cir.1986). In such a case, the broker has omitted telling the investor the recommendation is unsuitable for the investor's interests. The court may then use traditional laws concerning omission to examine the claim.

Under a misrepresentation or omission theory, a plaintiff can establish § 10(b), Rule 10b–5 liability by showing that in connection with the purchase or sale of a security—the broker made an untrue statement of a material fact, or failed to state a material fact, that in so doing, the broker acted knowingly with intent to deceive or defraud, and that plaintiff relied on the misrepresentations, and sustained damages as a proximate result of the misrepresentations. *Farlow v. Peat, Marwick, Mitchell & Co.,* 956 F.2d 982, 986 (10th Cir.1992).

---

**3.** This rule provides: "Every member organization is required ... to (1) Use due diligence to learn the essential facts relative to every customer, every order, every cash or margin account accepted or carried by such organization."

**4.** Article 3, § 2 of these Rules states:

In recommending to a customer the purchase, sale or exchange of any security, a member shall have reasonable grounds for believing that the recommendation is suitable for such customer upon the basis of the facts, if any, disclosed by such customer as to his other securities holdings and as to his financial situation and need.

**5.** This circuit has not decided whether a violation of these rules gives rise to a private cause of action. *See Utah State Univ. of Agric. & Applied Science v. Bear, Stearns & Co.,* 549 F.2d 164, 168–69 (10th Cir.), *cert. denied,* 434 U.S. 890, 98 S.Ct. 264, 54 L.Ed.2d 176 (1977). We need not decide the issue today for actions which violate the NASD Rules may give rise to a violation of § 10(b) of the Securities Exchange Act. *Lamula,* 583 F.2d at 599–600.

In contrast, Ms. O'Connor asserts an unsuitability claim based on fraud by conduct. She does not assert Mr. Foulke omitted to tell her the stocks he purchased were unsuitable for her investment needs. Rather, she claims that his purchase of the stocks for her account acted as fraud upon her.

Fraud by conduct is a violation of Rule 10b–5(a) and (c) and is analogous to a churning claim. *Trujillo*, at *61; *Woodruff v. Merrill Lynch, Pierce, Fenner, & Smith, Inc.*, Fed.Sec.L.Rep. (CCH) ¶ 95,386, 1989 WL 224581 at *3 1989 U.S.Dist.Lexis 17196 at *9 (D.Neb. July 14, 1989). Churning is excessive trading on an account by a broker in light of the investor's objectives. *Hotmar v. Lowell H. Listrom & Co.*, 808 F.2d 1384, 1385–86 (10th Cir.1987). This circuit has also recognized a violation of the NYSE Know Your Customer rule and the NASD Suitability Rule can be used to determine whether an account had been churned. *Id.* at 1386–87. *See also Miley v. Oppenheimer & Co., Inc.*, 637 F.2d 318, 333 (5th Cir.1981). The *Miley* court acknowledged these rules are excellent tools to assess the *"reasonableness or excessiveness* of a broker's handling of an investor's account."* 637 F.2d at 333 (emphasis added). Thus, the rules are used to assess the quantity and quality of the broker's trading activity.

As noted above, churning deals with the quantity of securities purchased for an account, while unsuitability concerns the quality of the purchased securities. Federal courts have used the NYSE and NASD rules to analyze both forms of broker misconduct. Thus, we will examine the elements of a churning claim to aid our analysis of unsuitability elements.

While the elements of a churning claim are well established, the elements of an unsuitability claim based on fraud are not.

To sustain a churning claim, the plaintiff must prove: (1) trading in the account is excessive in light of the investor's objectives; (2) the broker exercised control over trading in the account; and (3) the broker acted with an intent to defraud or with willful disregard for the investor's interests. *Hotmar*, 808 F.2d at 1385.

■ Because an unsuitability claim is so similar to a churning claim, we are persuaded the established "churning" elements can aid in our determination of the appropriate elements for an unsuitability cause of action. Today we adopt three elements to establish unsuitability based on fraud by conduct: The plaintiff must prove (1) the broker recommended (or in the case of a discretionary account purchased) securities which are unsuitable in light of the investor's objectives; (2) the broker recommended or purchased the securities with an intent to defraud or with reckless disregard for the investor's interests; and (3) the broker exercised control over the investor's account.[6]

Whether the control element of a churning claim applies to its cousin the unsuitability claim has been an open question. We believe the control element is essential to satisfy the causation/reliance requirement of a § 10(b), Rule 10b–5 violation.

■ In this case, we conclude the scienter element is dispositive. Based on our review of the record we hold Ms. O'Connor has failed, as a matter of law, to establish the scienter requirement of an unsuitability claim and affirm the district court's summary judgment against Ms. O'Connor's § 10(b), Rule 10b–5 claim.

A cause of action under § 10(b) and Rule 10b–5 requires scienter. *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 193, 96 S.Ct.

6. In establishing these elements we incorporate the Second Circuit's test for unsuitability and add the element of control. The Second Circuit has developed elements for an unsuitability claim not based on misrepresentations or omissions. The plaintiff must merely prove a recommendation of unsuitable securities and scienter. *Lamula*, 583 F.2d at 600. Unsuitability can be found where the investor proves the broker knew or reasonably believed the recommended securities were unsuitable but recommended them anyway. We acknowledge the unsuitability cases do not always distinguish between fraud by conduct and fraud by misrepresentation or omission. In fact, the *Lamula* court uses omission language in its discussion of fraud by conduct. Essentially, the court examined the alleged omission as probative of the defendant's scienter. No separate fraud by omission claim existed.

1375, 1381, 47 L.Ed.2d 668 (1976); *Utah State Univ.*, 549 F.2d at 169. We have held that recklessness satisfies the scienter requirement for a § 10(b), Rule 10b–5 violation. *Hackbart v. Holmes*, 675 F.2d 1114, 1117 (10th Cir.1982). Therefore, in our test for unsuitability a plaintiff must show the broker purchased the securities with an intent to defraud or with reckless disregard for the investor's interests. Recklessness is defined as "conduct that is 'an extreme departure from the standards of ordinary care, and which presents a danger of misleading buyers or sellers that is either known to the defendant or is so obvious that the actor must have been aware of it.' " *Id.* at 1118 (quoting *Sundstrand Corp. v. Sun Chemical Corp.*, 553 F.2d 1033, 1045, *cert. denied*, 434 U.S. 875, 98 S.Ct. 225, 54 L.Ed.2d 155 (1977)).

Ms. O'Connor alleges facts exist sufficient to prove Defendants' scienter. She asserts this proof consists of evidence of self-dealing including an increase in fees, and misrepresentations and omissions[7] concerning (1) the commissions; (2) Mr. Foulke's lack of qualifications as an investment advisor; (3) the unsuitable nature of the purchased securities; (4) the depletion of principal due to monthly withdrawals; and (5) the promise that she would receive $20,000 a year in income from the oil and gas investment.

The parties do not dispute the basic facts of this case. Ms. O'Connor presented the fact that Mr. Foulke charged a one percent fee per year for financial services. In addition, he received a fifty percent commission split with Lafferty. However, the record reflects Ms. O'Connor was aware of the fees and commissions she paid to Mr. Foulke because they were reported in the monthly statements she received concerning her account.

Ms. O'Connor also presented deposition testimony that Lafferty was the underwriter for R.T. Corporation and Patient Medical Systems. Additional evidence established that Mr. Foulke was himself a director of Kerkoff. Yet, when deposed, Ms. O'Connor testified that she considered an investment less risky if Mr. Foulke were involved with the company. Furthermore, the prospectuses Ms. O'Connor received properly disclosed the fact Lafferty was the underwriter for several of the issues in which Mr. Foulke invested.

Next, Ms. O'Connor contends Mr. Foulke omitted to tell her he was not qualified as an investment advisor. In support, Ms. O'Connor presented deposition testimony that Mr. Foulke is not an investment advisor and has never been registered with the Securities Exchange Commission. But Mr. Foulke's deposition also revealed he never held himself out to be an investment advisor.

To prove the unsuitable nature of securities purchased by Mr. Foulke, Ms. O'Connor presented evidence that her investment objectives were conservative. She then presented evidence tending to show the securities in which Mr. Foulke invested were risky. For example, Ms. O'Connor demonstrated that the prospectus for Patient Medical Systems said it involved a high degree of risk and the investor should be prepared to lose her entire investment. However, in his deposition, Mr. Foulke testified he believed that Patient Medical Systems was only modestly risky and that risk was mitigated because Lafferty was the underwriter.

Ms. O'Connor testified in her deposition a geologist friend told her the oil and gas partnerships which Mr. Foulke purchased for her account were a bad investment and she should get out of them. But, Ms. O'Connor knew that Mr. Foulke had investigated the oil and gas operation before investing in it. In fact, he personally investigated all investment opportunities before he purchased any securities for Ms. O'Connor's account.

Furthermore, Mr. Foulke was able to give his reasons for purchasing each of the units of stock to which Ms. O'Connor objects. For example, Mr. Foulke testified

---

7. Ms. O'Connor does not allege a separate claim of fraud based on misrepresentation and omission. Instead, she claims the Defendants' misrepresentations and omissions evidence sufficient recklessness to sustain the scienter requirement for a § 10(b), Rule § 10b–5 claim.

the purchase of units in R.T. Acquisition Corporation was appropriate for Ms. O'Connor's account because he believed only low risk was involved because each shareholder would get back dollar for dollar invested with no dilution. He also felt the purchase of units in Kerkoff was appropriate based on the company's longstanding reputation and own his conversations with the owners of the company. He was also very impressed with the fact that the first day Kerkoff stock was listed it listed on the American Stock Exchange.

Additionally, Ms. O'Connor claimed Mr. Foulke omitted to tell her that her principal was being depleted by monthly withdrawals. She then presented Mr. Foulke's deposition testimony wherein Mr. Foulke stated he never expressly informed Ms. O'Connor that her monthly withdrawals were depleting her principal. Further testimony revealed that Mr. Foulke knew the $200,000 with which Ms. O'Connor opened her account comprised nearly all of her assets. Testimony also established Mr. Foulke knew Ms. O'Connor was unemployed, so if the account lost money she had no way to replace it other than through the account itself. Yet, Ms. O'Connor was notified of the activity in her account by trade tickets and monthly statements. These statements clearly reflect the fact the monthly withdrawals did deplete her principal.

We conclude the facts presented fail to rise to the level of recklessness necessary to sustain a section § 10(b), Rule 10b–5 claim. No indication appears in the record that Mr. Foulke intentionally or recklessly defrauded Ms. O'Connor. Instead, the record reflects Mr. Foulke successfully handled Ms. O'Connor's account for many years. Therefore, we affirm the district court's summary judgment order against Ms. O'Connor's § 10(b), Rule 10b–5 claim.

### B. Common Law Fraud and State Securities Claims

■ Ms. O'Connor's common law fraud claim and the state analogue to § 10(b), Rule 10b–5 both require recklessness. *See Otis & Co. v. Grimes*, 97 Colo. 219, 48 P.2d

788, 789 (1935) (reckless disregard of the truth or falsity of a statement is sufficient to allege fraud); *Hawkinson v. A.H. Robins Co.*, 595 F.Supp. 1290, 1312 (D.Colo. 1984) (fraudulent misrepresentation satisfied if defendant acts with reckless disregard of the truth or falsity of the statement); Colo.Rev.Stat. §§ 11–51–123 and 11–51–125(2); *Goss v. Clutch Exch., Inc.*, 701 P.2d 33, 34–35 (Colo.1985) (federal authorities' interpretation of provisions which parallel those of the Colorado Securities Act are persuasive). Thus, these claims were properly dismissed for the same reasons as summary judgment was granted against the federal § 10(b), Rule 10b–5 claim. Accordingly, we affirm the district court's dismissal of Ms. O'Connor's common law fraud claim as well as her claim based on Colo.Rev.Stat. §§ 11–51–123 and 11–51–125(2).

■ However, liability under the state analogue to § 12(2)[8] only requires negligence. *See* Colo.Rev.Stat. § 11–51–125(3); *Pottern v. Bache Halsey Stuart, Inc.*, 41 Colo.App. 451, 589 P.2d 1378, 1379 (1978) (state analogue to federal Section 12(2) requires only negligence of the defendant). We have held the Defendants' conduct does not rise to the level of recklessness sufficient to sustain a claim under § 10(b), Rule 10b–5. We have not determined whether Defendants' conduct was negligent. Ms. O'Connor's claim based on Colo.Rev.Stat. § 11–51–125(3) must be remanded for determination by the district court. We therefore remand Ms. O'Connor's state securities claim based on a violation of Colo. Rev.Stat. § 11–51–125(3) to the district court for determination.

### C. Arbitration

The district court granted Mr. Foulke's and Lafferty's motion to compel arbitration of Ms. O'Connor's remaining state law claims. The court held Defendants were third party beneficiaries of a customer agreement providing for arbitration between Ms. O'Connor and Lafferty's clearing broker, Gintel. Therefore, the district

---

**8.** Ms. O'Connor did not allege a federal claim based on § 12(2).

court concluded Mr. Foulke and Lafferty could enforce the arbitration clause. The court also found Mr. Foulke and Lafferty had not waived their right to arbitration.

In its Order compelling arbitration the district court stated:

[Ms. O'Connor] had an agreement with Gintel. The customer contract plainly reflects that Gintel was acting on Lafferty's behalf. The agreement is expressly stamped, "Through the Courtesy of R.F. Lafferty & Co." in bold print at the top, and various paragraphs indicate that Lafferty acted as [Ms. O'Connor's] introducing broker. (*See, e.g.,* ¶ 5, 14). Lafferty monitored the account through Foulke and communicated directly with [Ms. O'Connor] his involvement through monthly statements. Lafferty employed only Gintel to act as its clearing broker, so the only reasonable construction of this agreement indicates that Lafferty was the third-party beneficiary of the customer agreement.

*O'Connor v. R.F. Lafferty & Co. Inc.,* No. 89–F–55 at 4 (D.Colo. Nov. 28, 1989) (citations omitted).

Ms. O'Connor asserts the district court erred by finding Mr. Foulke and Lafferty were third party beneficiaries to the customer agreement. She claims that at most the Defendants were incidental beneficiaries as she did not intend to confer any benefit on them by signing the agreement. Ms. O'Connor further asserts the district court placed too much emphasis on the fact the agreement is stamped "Through the Courtesy of R.F. Lafferty & Co." at the top. She argues nothing in the text or circumstances surrounding the execution of the agreement indicates the stamped words mean anything other than the agreement was provided to her as a courtesy of Lafferty. She also cites case law holding an introducing broker, such as Lafferty, is not a third party beneficiary of a customer agreement between the clearing broker and the investor.

■ "[D]etermination of arbitrability is subject to de novo review." *Pioneer Properties, Inc. v. Martin,* 776 F.2d 888, 891 n. 2 (10th Cir.1985) (citing *Mediterranean Enters., Inc. v. Ssangyong,* 708 F.2d 1458, 1462–63 (9th Cir.1983)). Because it is based on contract interpretation, arbitrability is a legal question which we review de novo. *See Teton Exploration Drilling, Inc. v. Bokum Resources Corp.,* 818 F.2d 1521, 1526 (10th Cir.1987). The district court's underlying factual findings will be set aside only if we find they are clearly erroneous. *Adair State Bank v. American Casualty Co.,* 949 F.2d 1067, 1072 (10th Cir.1991).

■ The customer agreement which contains the arbitration clause falls within the scope of the Federal Arbitration Act (FAA), 9 U.S.C. §§ 1–16 (1991). *See Mayaja, Inc. v. Bodkin,* 803 F.2d 157, 160 (5th Cir.1986) (customer agreement between broker and investor to transact in securities involves interstate commerce invoking applicability of FAA), *cert. denied,* 482 U.S. 927, 107 S.Ct. 3210, 96 L.Ed.2d 697 (1987). Therefore, federal law applies to the interpretation of the arbitration clause. *See Moses H. Cone Memorial Hosp. v. Mercury Constr. Corp.,* 460 U.S. 1, 24, 103 S.Ct. 927, 941, 74 L.Ed.2d 765 (1983); *Mitsubishi Motors Corp. v. Soler Chrysler–Plymouth, Inc.,* 473 U.S. 614, 626, 105 S.Ct. 3346, 3353–54, 87 L.Ed.2d 444 (1985).

■ If a nonsignatory to an agreement is a third-party beneficiary then he is able to enforce the agreement. An intent to benefit the third party must be apparent from the construction of the contract in light of all surrounding circumstances to qualify that party as a third party beneficiary. *Mowbray v. Moseley, Hallgarten, Estabrook & Weeden, Inc.,* 795 F.2d 1111, 1115–17 (1st Cir.1986); *Northern Natural Gas Co. v. Grounds,* 666 F.2d 1279, 1287 (10th Cir.1981), *cert. denied,* 457 U.S. 1126, 102 S.Ct. 2947, 73 L.Ed.2d 1342 (1982). Thus, the key inquiry when determining whether a nonsignatory to an agreement is a third party beneficiary is the intent of the parties. *Mowbray,* 795 F.2d at 1117; *see also McPheeters v. McGinn, Smith & Co.,* 953 F.2d 771, 773 (2d Cir.1992).

■ A majority of courts, when presented with facts similar to the case at

bar, have found that an introducing broker is not a third party beneficiary to a customer agreement between a clearing broker and an investor. *See, e.g., McPheeters*, 953 F.2d at 173; *Mowbray*, 795 F.2d at 1117; *Wilson v. D.H. Blair & Co., Inc.*, 731 F.Supp. 1359, 1362–63 (N.D.Ind.1990); *Lester v. Basner*, 676 F.Supp. 481, 484 (S.D.N.Y.1987); *Billue v. Hyer, Bikson & Hinsen, Inc.*, No. 88–2331–S, 1989 WL 21280, 1989 U.S.Dist. LEXIS 2415 (D.Kan. Feb. 15, 1989); *Kelly v. Robert Ainbinder & Co.*, Fed.Sec.L.Rep. (CCH) ¶ 94,963, p. 95391, 1990 WL 26809 (S.D.N.Y.1990); *Antinoph v. Laverell Reynolds Sec., Inc.*, Fed.Sec.L.Rep. (CCH) ¶ 94765, 1989 WL 67332 (June 19, 1989). However, the Eighth Circuit allowed a trading broker who was not party to a margin agreement enforce the arbitration clause as a disclosed agent of the clearing house and as a third party beneficiary. *Nesslage v. York Sec., Inc.*, 823 F.2d 231, 233–34 (8th Cir.1987).

We align with the majority in concluding an introducing broker cannot enforce an arbitration agreement between an investor and clearing broker as a third party beneficiary. We hold Mr. Foulke and Lafferty cannot invoke the arbitration clause of the customer agreement between Ms. O'Connor and the clearing agent because the agreement evidences no intent to benefit them.

No evidence of any intent to benefit Mr. Foulke or Lafferty can be inferred from the text of the customer agreement between Ms. O'Connor and the clearing broker. Neither Lafferty nor Mr. Foulke is a signatory to the agreement. The introduction paragraph of the customer agreement states: "In consideration of your accepting one or more accounts of the undersigned ... and your agreeing to act as brokers for the undersigned in the purchase or sale of securities ... the undersigned agrees as follows...." The arbitration clause reads: "Any controversy between you and the undersigned arising out of or relating to this contract or the breach thereof, shall be settled by arbitration, in accordance with the rules, then obtaining...." The "you" in these clauses clearly refers to the clearing broker and "the undersigned" refers only to Ms. O'Connor. The only reference to Lafferty is the stamp at the top of the agreement which states, "Through the Courtesy of R.F. Lafferty & Co." We decline to extend to this language the inference that it creates a third party beneficiary status for Lafferty.

The circumstances surrounding execution of the agreement also do not indicate an intent by the parties to confer a benefit on Mr. Foulke or Lafferty. When Ms. O'Connor received the agreement she called Mr. Foulke to find out what it meant. Ms. O'Connor asserts Mr. Foulke told her she needed to sign the agreement so trades could be made on her account by the clearing broker. Mr. Foulke did not indicate to Ms. O'Connor the agreement effected their relationship in any way.

If Mr. Foulke and Lafferty wanted Ms. O'Connor to be bound to arbitrate with them, they could have easily executed their own agreement with her. If the shoe were on the other foot and Ms. O'Connor was attempting to bind Lafferty to arbitration based on this agreement, Lafferty could easily argue no agreement to arbitrate existed between the two of them. No basis exists upon which to find a valid agreement to arbitrate between Lafferty and Ms. O'Connor. In the absence of a valid agreement to arbitrate a party cannot be forced to submit her dispute to arbitration. *Mitsubishi*, 473 U.S. at 626, 105 S.Ct. at 3353. Therefore, the order of the district court compelling arbitration is reversed and we remand Ms. O'Connor's state claims to the district court for determination.[9]

### D. Attorneys' Fees

Ms. O'Connor requested an award of attorneys' fees asserting the Defendants moved to compel arbitration based on an arbitration agreement to which they were

9. Ms. O'Connor is a resident of Colorado. Mr. Foulke and Lafferty are residents of New York. The district court retains jurisdiction over Ms. O'Connor's state claims based on diversity. 28 U.S.C. § 1332.

not a party and the Defendants ignored established law concerning waiver of arbitration which would have precluded their right to arbitration had they been a party to the agreement. The district court implicitly denied this request when it issued an order compelling Ms. O'Connor to submit her claims to arbitration.

Ms. O'Connor asserts that because the district court erred by compelling arbitration it also erred by failing to award her attorneys' fees. She claims entitlement to attorneys' fees on the following grounds: (1) Defendants brought their motion to compel arbitration in bad faith, vexatiously, wantonly or for oppressive reasons, and (2) pursuant to 28 U.S.C. § 1927 and Fed. R.Civ.P. 11, the Defendants were aware they waived any right to arbitration but refused to withdraw their motion to compel.

■ We give deference to a district court's decision regarding attorneys' fees. We only overturn these decisions where the district court abuses its discretion. *Goichman v. City of Aspen,* 859 F.2d 1466, 1471 (10th Cir.1988).

■ The facts of this case do not warrant an award of attorneys' fees on either of the asserted bases. A split of authority exists as to whether an introducing broker can enforce an arbitration agreement between an investor and clearing broker as a third party beneficiary. Defendants therefore had a reasonable basis upon which to bring their motion to compel arbitration. We hold the motion to compel arbitration was not brought in bad faith, vexatiously, wantonly or for oppressive reasons. Second, although we did not reach the question of waiver, the Defendants persuaded the district court they did not waive their right to arbitration. We refuse to conclude the Defendants' alleged waiver was so obvious that to pursue it subjects defendants to sanctions. We decline to award Ms. O'Connor attorneys' fees and affirm the district court's implicit denial of her request.

### III. CONCLUSION

We AFFIRM the district court's grant of summary judgment in favor of the Defendants and against Ms. O'Connor's § 10(b), and Rule 10b–5 claim. We also AFFIRM the dismissal of Ms. O'Connor's common law fraud claim as well as her state securities claim pursuant to Colo.Rev.Stat. §§ 11–51–123 and 11–51–125(2) (state analogues to § 10(b)). We REVERSE the district court's order compelling arbitration and REMAND Ms. O'Connor's remaining state claims to the district court for determination. These claims include the state securities claim based on violation of Colo. Rev.Stat. 11–51–125(3) (state analogue to § 12(2)); breach of fiduciary duty; negligent failure to supervise; professional negligence; and intentional infliction of emotional distress. Finally, we AFFIRM the district court's implicit denial of Ms. O'Connor's request for attorneys' fees.