**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**MAY 7 2003**

**PATRICK FISHER**
**Clerk**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

OIL, CHEMICAL AND ATOMIC
WORKERS INTERNATIONAL UNION
LOCAL 5-391; LOCAL 5-857 OIL,
CHEMICAL & ATOMIC WORKERS
INTERNATIONAL UNION, sued as: Oil,
Chemical & Atomic Workers International
Union (AFL-CIO) and its Local 5-857,
Labor Organizations,

        Plaintiffs - Appellees
        - Cross-Appellants,

v.

CONOCO, INC., a Delaware corporation,

        Defendant - Appellant
        - Cross-Appellee.

Nos. 01-5222 & 02-5000
(D.C. No. 97-CV-682-H)
(N. District of Oklahoma)

**ORDER AND JUDGMENT**[*]

Before **TACHA**, Chief Judge, **LUCERO** Circuit Judge and **ROBINSON**[**],
District Judge.

---

[*] This order and judgment is not binding precedent, except under the
doctrines of law of the case, res judicata, and collateral estoppel. This court
generally disfavors the citation of orders and judgments; nevertheless, an order
and judgment may be cited under the terms and conditions of 10th Cir. R. 36.3.

[**] The Honorable Julie A. Robinson, United States District Judge for the
District of Kansas, sitting by designation.

This case has previously been before us. <u>Oil, Chem. & Atomic Workers Int'l Union v. Conoco, Inc.</u>, 241 F.3d 1299, 1301 (10th Cir. 2001). Following our remand, the district court parsed the parties claims as to the arbitrability of union grievances under several collective-bargaining agreements ("CBAs"), and referred certain issues to arbitration while holding others not arbitrable as a matter of law. We now consider cross-appeals from both Conoco, Inc. ("Conoco") and the Oil, Chemical and Atomic Workers International Union (AFL-CIO) and its Local 5-857 ("the Union"). Exercising jurisdiction pursuant to 28 U.S.C. § 1291, we affirm in part and reverse in part.

## I

Under the terms of three separate CBAs, the Union filed numerous grievances against Conoco, challenging, inter alia, Conoco's handling of certain job reductions at its Ponca City, Oklahoma refinery.[1] Each CBA contains a provision entitled "Settlement of Grievances," which provides:

> A grievance is a dispute or conflict between the Company and the Union as to the interpretation or application of the terms of this Agreement.
> . . . .
> Only differences arising between the Union and the Company relating to interpretation or performance of this Agreement which cannot be adjusted by mutual agreement and have gone through the grievance procedure are arbitrable, except as otherwise provided in this Agreement.

---

[1] The three collective-bargaining agreements include: (1) the "Refinery Agreement"; (2) the "Technology Agreement"; and (3) the "Clerical Agreement."

-2-

(Appellant's App. at 94–95.)  When the parties could not settle the grievances through the initial grievance procedure outlined in the CBAs, the Union requested arbitration.  Conoco refused, citing the "Management's Rights" provision contained in each CBA, which provides:

> Grievances originating under [this Management's Rights Clause] are subject to the grievance procedure <u>but cannot be submitted to arbitration</u>; and no arbiter has the authority to rule on [this clause] with the exception of determination of just cause. . . .

(<u>Id.</u> at 71 (emphasis added).)  In each of the CBAs, this Management's Rights Clause sets forth certain functions that are "solely the responsibility of management," including "[h]iring, maintaining order, and discipline or discharge" and "the assignment of work <u>subject only to other provisions of [the Agreement]</u>." (<u>Id.</u> at 70 (emphasis added).)  Thus, the CBAs are subject to the grievance and arbitration process in their entirety, except for grievances "originating" under the Management's Rights Clause.  Conoco refused the Union's requests for arbitration on the theory that each of the grievances filed by the Union "originates" under the Management's Rights Clause without implicating other terms of the CBA.

In July 1997, the Union brought suit against Conoco, seeking to compel arbitration of the grievances.  In a Joint Statement as to Grievance Classifications, the parties placed the grievances into four separate categories.  The first three

categories of grievances relate to Conoco's use of contract workers at its Ponca City, Oklahoma refinery, while the fourth category relates to the use of a non-bargaining-unit member to perform certain clerical work. On May 20, 1999, the district court issued an order sending all the grievances to arbitration without determining arbitrability. Oil, Chem. & Atomic Workers Int'l Union v. Conoco, Inc., No. 97-CV-682-H, slip op. at 2 (N.D. Okla. May 20, 1999). However, the Tenth Circuit vacated and remanded this order, holding that Conoco was entitled to a ruling on the arbitrability of the Union's grievances before being compelled to submit to arbitration. Oil, Chem. & Atomic Workers Int'l Union, 241 F.3d at 1301. On remand, the district court determined that: (1) grievances in Category One and Category Two are arbitrable, and must be submitted to arbitration; (2) the Category Three grievance is moot; and (3) the Category Four grievances are not arbitrable as a matter of law. Conoco now appeals the district court's determination that grievances in Category One and Category Two are arbitrable; the Union, on cross-appeal, argues that grievances in Category Three and Category Four should also be sent to arbitration.

**II**

We review de novo the question of whether a dispute is arbitrable under a collective-bargaining agreement. O'Connor v. R.F. Lafferty & Co., Inc., 965 F.2d 893, 901 (10th Cir. 1992). In determining whether the parties have agreed to

arbitrate an issue, we are guided by certain well-established rules. First, "arbitration is a matter of contract and a party cannot be required to submit to arbitration any dispute which he has not agreed so to submit." United Steelworkers of Am. v. Warrior & Gulf Navigation Co., 363 U.S. 574, 582 (1960). The second rule, "follow[ing] inexorably from the first," AT&T Techs., Inc. v. Communications Workers of Am., 475 U.S. 643, 649 (1986), is that "the *question of arbitrability* is an issue for judicial determination [u]nless the parties clearly and unmistakably provide otherwise," Howsam v. Dean Witter Reynolds, Inc., 123 S. Ct. 588, 591 (2002) (alteration in original) (quotation omitted). Third, in reviewing the parties' grievances, the court is not to rule on the potential merits of the underlying claims. AT&T, 475 U.S. at 649. As the Supreme Court has noted, "[w]hether 'arguable' or not, indeed even if it appears to the court to be frivolous, the union's claim that the employer has violated the collective-bargaining agreement is to be decided, not by the court asked to order arbitration, but as the parties have agreed, by the arbitrator." Id. at 649–50. Finally, there is a presumption of arbitrability, meaning that an "order to arbitrate the particular grievance should not be denied unless it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute. Doubts should be resolved in favor of coverage." Id. at 650 (emphasis added) (quotation omitted). "[O]nly the most forceful evidence of a

purpose to exclude the claim from arbitration can prevail." Id. at 651 (quotation omitted). This principle "recognizes the greater institutional competence of arbitrators in interpreting collective-bargaining agreements." Id. at 650.

With these principles in mind, we consider the four categories of grievances.

## III

The first two categories relate to Conoco's use of contract workers at its Ponca City, Oklahoma refinery. Conoco argues that its use of contract workers is governed solely by Article 12 of the Refinery Agreement, the Management's Rights Clause of this particular CBA, which gives the Union the right to transfer employees and to assign work. Because the dispute originates under the Management's Rights Clause, Conoco argues, this issue is not arbitrable as a matter of law. In response, the Union emphasizes that under the Management's Rights Clause, Conoco's rights are "subject . . . to other provisions [in the] Agreement." (Appellant's App. at 70–71.) The question presented, therefore, is whether Conoco's right to transfer and assign work in this instance is indeed limited by "other provisions [in the] Agreement." (Id.)

According to the Union, Article 36 of the Refinery Agreement limits Conoco's right to contract out work in two important ways, rendering the dispute

concerning Conoco's use of contract workers arbitrable.  First, Article 36

provides:

> The Company agrees that it will not bring contractors into the plant to perform production or maintenance work if it will result in the lay-off of regular, full-time employees.

(Id. at 97.)  In the instant case, employees were not separated from service, but

transferred into the general labor pool.  Concluding that the term "lay-off," as

used in the Agreement, "unequivocally requires a separation from service," the

district court found that the first limitation in Article 36 was not implicated.[2]  Oil,

---

[2]  Article 8 provides:

TERMINATION OF REGULAR, FULL-TIME EMPLOYEES DUE TO FORCE REDUCTION
> The Company shall give the Union 90 days' written notice prior to the termination of regular, full-time employees due to a force reduction.  During the 90-day period, the Company will discuss this matter with the Union for the purpose of determining ways and means of avoiding the force reduction or lessening the effect on the employees involved.
> The Ponca City Refinery bargaining unit employee with the most recent date of regular, full-time status will be the first employee laid-off.

(Appellant's App. at 69.)
Article 34 explains the procedure by which layoffs and recalls are to be accomplished:

LAYOFF AND RECALL
34-1  In the event of a force reduction in the Ponca City Refinery, casual, temporary, and probationary employees in the bargaining unit will be laid off first.  After all the casual, temporary, and probationary employees are laid off, the

<u>Chem. & Atomic Workers Int'l Union v. Conoco, Inc.</u>, No. 97-CV-682-H, slip op. at 6 (N.D. Okla. Nov. 19, 2001).  While the Union does not contend that there have been separations from service, it nevertheless maintains that because Union employees were given lower-paying jobs, there have been constructive lay-offs implicating Article 36.  We disagree.  Insofar as the term "lay-off" is clearly used in the Refinery Agreement to indicate a separation from service, a condition not present in any of the grievances, there is no need to send this issue to arbitration.  We conclude that interpretation of the first limitation in Article 36 is unnecessary and, thus, the grievances in question are not arbitrable under this provision as a matter of law.

A second limitation contained in Article 36 provides:

> In addition, maintenance craft work will not be contracted as long as there are employees holding numbers in the crafts in which work is contracted working as laborers.[3]

---

> employee with the most recent date of regular, full-time status who is a bargaining unit employee in the Ponca, City Refinery at the time of the force reduction will be the first employee laid off. . . .

(<u>Id.</u> at 96.)

[3]  A person "holds a number" if he is assigned to a position in a recognized department or craft, which is referred to at the Conoco refinery as a "progression unit."  (Appellant's App. at 51.)  Each progression unit consists of two kinds of employees:  "full numbers" who are full-time workers in the progression, and "replacement numbers" who are people who fill in when the full numbers are not available.  (<u>Id.</u> at 21.)  "Holding numbers" refers to full numbers and replacement numbers.  (<u>Id.</u>)

(Appellant's App. at 97.) According to Conoco's interpretation of this provision, when a Union-represented employee is removed from his craft and transferred to a different position (including the position of laborer), that employee loses his number. If Conoco subsequently hires a contract worker to fill the slot in the craft from which the Union employee was just transferred, Article 36 is not implicated because that Union-represented employee no longer holds a number in the craft. Because Article 36 is not implicated, agues Conoco, there is no limitation on management's rights under Article 12 and the matter is not arbitrable as a matter of law.

In response, the Union argues that this interpretation would render nugatory the second limitation on the use of contract workers in Article 36 because it would effectively allow Conoco to destroy the Union by replacing all Union-represented employees holding a number in a craft with contract workers. A more reasonable interpretation of Article 36, the Union argues, is that "so long as there are employees holding numbers in a particular craft, no contractor will work in that craft." (Id. at 21.)

Because our inquiry is limited to deciding arbitrability, we do not decide which interpretation is the stronger. Under Article 31 of the Refinery Agreement, differences arising between the Union and Conoco relating to the interpretation or performance of the Agreement (except for those disputes that "originate" under

-9-

Article 12) are arbitrable. Given these competing interpretations of the second limitation in Article 36, and keeping in mind the presumption of arbitrability, AT&T, 475 U.S. at 650, we are unable to say "with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute," id. Thus, we conclude that the district court was correct to find that an interpretation of the second limitation in Article 36 is necessary to resolve the grievances at issue.

**IV**

The Category Three grievance presents precisely the same issue we considered in Categories One and Two above, with one difference: the individual involved, Virgil Palmer, is no longer employed by Conoco. This fact, coupled with the fact that the only remedy sought for Palmer was that Conoco "recognize Mr. Palmer's seniority ranking and keep him in the transportation progression," led the district court to conclude that the grievance is moot and therefore not arbitrable as a matter of law. Oil, Chem. & Atomic Workers Int'l Union, slip op. at 7 (N.D. Okla. Nov. 19, 2001).

On appeal, the Union argues that the issue of mootness is itself a question that should be resolved by an arbitrator. In considering whether the question of mootness is a "question of arbitrability," Howsam, 123 S. Ct. at 591, we note that although "one might call any potentially dispositive gateway question a 'question

of arbitrability,' . . . for purposes of applying the interpretive rule, the phrase 'question of arbitrability' has a far more limited scope." Id. at 592.   For example, in Howsam, the Supreme Court held that the issue of whether the statute of limitations has run is a question for the arbitrator, notwithstanding the fact that an Article III court could have easily interpreted and applied the NASD rule in the circumstances of that case.  In inventorying the issues that are not "questions of arbitrability" subject to review by the courts, i.e., time limits, notice, laches, and estoppel, the Supreme Court did not address mootness.  Nevertheless, it is evident that the inquiry involved in assessing whether a statute of limitations has run (when a cause of action has accrued or expired) is akin to a mootness inquiry (when a cause of action is no longer viable) for purposes of determining questions of arbitrability.[4]

Furthermore, in Howsam, the Court noted that the phrase "question of arbitrability" is limited to "the kind of narrow circumstance where contracting parties would likely have expected a court to decide the gateway matter." Id. While the Refinery Agreement does not specifically address who should decide questions of mootness, the Supreme Court has held that when faced with a broad

---

[4] In Howsam, the particular statute of limitations involved was a NASD time-limit rule.  While this fact had some bearing on the Court's determination, the Court's references to time-limit rules generally suggest that the Court's holding is not limited to only those time-limit rules belonging to a particular arbitral body.

arbitration clause, as we are in the instant case, "only the most forceful evidence of a purpose to exclude the claim from arbitration can prevail." AT&T, 745 U.S. at 650. We can find no evidence to suggest that the parties intended, in agreeing to send nearly all grievances to arbitration, that the question of whether those grievances were moot should not also be sent to arbitration.

Given the tightly circumscribed role that the courts are assigned in determining arbitrability, and considering that arbitrators have broad equitable powers to fashion remedies, it is not for us to decide that a remedy will not be available for a particular grievance. As discussed herein, the underlying dispute regarding Article 36 presents an issue of interpretation for the arbitrator and must be sent to arbitration. While our fealty to Supreme Court precedent may stand us accused of hyper-technicality, nonetheless, we conclude that the issue of mootness is also a question for the arbitrator, and reverse the judgment of the district court on this issue.

## V

Category Four contains two grievances arising under the Clerical Agreement. In the first instance, the Union challenges the posting of the position of "Yields Analyst" in the company's Candidate Generation system on the grounds that "[t]he responsibilities listed for this position are currently performed by the represented employees in the Yields Department" and therefore must

"continue to be filled by represented personnel." (Appellant's App. at 251.)

Conoco refused to arbitrate the grievance on the grounds that the Management's

Rights portion of the Clerical Agreement, Article 16, makes clear that the deletion

and creation of jobs, including the right to discontinue any part or all of the office

and clerical activities, is within Conoco's management's rights, a fact that the

Union does not contest. Thus, Conoco argues that this grievance originates solely

under the Management's Rights Clause and is not subject to arbitration.

As in the other CBAs previously discussed, the Management's Rights

provision in the Clerical Agreement is "subject . . . to other provisions of this

Agreement." The Union argues that Articles 1 and 5 constitute such "other

provisions" and limit Conoco's ability to delete and create jobs under Article 16.

Article 5 of the Clerical Agreement is entitled "Job Classifications and Rates and

Pay," incorporating appendices listing various job classifications with

corresponding rates of pay. Article 1 of the Clerical Agreement is entitled

"Recognition," and provides:

> The Company hereby recognizes the Union as the sole and exclusive
> representative for the purposes of collective bargaining with respect to rates
> of pay, wages, hours of employment, and other conditions of employment,
> for the employees . . . UNIT: INCLUDED: All offices and clerical
> employees in Conoco Inc.'s Ponca City, Oklahoma, refinery . . . .

(Id. at 137.) Concluding that there is nothing in Articles 1 or 5 that requires

interpretation such that an arbitrator is necessary to decide whether this grievance

-13-

falls within the Management's Rights article of the Clerical Agreement, the district court refused to send the Category Four grievances to arbitration. We agree with this conclusion. There is simply nothing in Articles 1 or 5 that places any limitation on Conoco's right to create and define the Yields Analyst position. Thus, because Articles 1 and 5 are not even arguably implicated, there is nothing to interpret and the grievance cannot be submitted to arbitration as a matter of law.

The second grievance in Category Four involves an incident in which a non-Union employee prepared and distributed retirement books, a function the Union maintains is strictly clerical and can only be performed by a represented employee. The Union concedes, however, that distribution of retirement books has been performed by management-level employees in the past, and that, under Article 16, Conoco has the right to assign work unless other provisions in the CBA place a limitation on Conoco's management's rights in this context. According to the Union, however, Articles 5 and 7 represent such "other provisions" and limit Conoco's power under Article 16 in this situation. Article 5 lists job classifications and Article 7 allows vacancies to be filled by seniority. After careful review of the parties' arguments and the relevant articles in the CBA, we conclude that Articles 5 and 7 place no limitations on Conoco's Management's Rights relevant to the challenged conduct, and no interpretation by an arbitrator is

required.  Thus, we affirm the district court's refusal to send this grievance to arbitration.

## VI

For the foregoing reasons, the judgment of the district court is **AFFIRMED** in part and **REVERSED** in part.

ENTERED FOR THE COURT


Carlos F. Lucero
Circuit Judge

**01-5222/02-5000,** *Oil, Chemical & Atomic Workers v. Conoco*

**TACHA**, Chief Circuit Judge, dissenting in part.

I join the court's opinion as to Parts I, II, IV, and V. I respectfully dissent as to Part III.

The Union argues that the grievances in Categories 1 and 2 originate under Article 36, which states:

> [Paragraph 1] The Company agrees that it will not bring contractors into the plant to perform production or maintenance work if it will result in the lay-off of regular, full-time employees.

> [Paragraph 2] In addition, maintenance craft work will not be contracted as long as there are employees holding numbers in the crafts in which work is contracted working as laborers.

I agree with the majority that Paragraph 1 is not implicated on the facts of this case because, contrary to the Union's contention, none of the employees involved in the grievances at issue was laid off. In the Refinery Agreement, the term "lay-off" refers to a separation from service. Because the Union did not even contend that any of the employees at issue were separated from service, the district court properly held that those grievances did not arise under Paragraph 1. Accordingly, the Category 1 and 2 grievances are not arbitrable as a matter of law.

Contrary to the majority's holding, however, Paragraph 2 does not apply either. First, it is not clear to me why an ostensible difference of interpretation as to the literal, unglossed meaning of Paragraph 2 is sufficient to force the parties to arbitration, while an ostensible difference of interpretation as to the meaning of "lay-off" in Paragraph 1 is not. The majority relies on the plain meaning of

Article 36 (Paragraph 1), Article 8, and Article 34 to hold as a matter of law that none of the grievances arises under Paragraph 1; so, presumably the distinction lies in the degree of certainty with which we may establish that the plain language of each provision does or does not support a grievance. But the plain meaning of Paragraph 2 is just as clear, to me, as that of Paragraph 1; indeed, we need not look beyond Paragraph 2 itself to hold as a matter of law that none of the grievances before us arises under it.

Paragraph 2 applies only to "employees holding numbers in the crafts in which work is contracted" who are "working as laborers." In other words, unless (1) an employee *holding a number* in a particular craft is (2) *working as a laborer* elsewhere in the refinery when (3) contractors are hired to do work in *that craft*, Paragraph 2 is not implicated and, as a matter of law, no grievance arises thereunder. Because the Union has failed to point to a single employee who was (1) holding a number while (2) working as a laborer when (3) Conoco hired contractors in the relevant craft, Paragraph 2 is not implicated on the facts of this case.

By declining to give any effect to the words "working as laborers" the district court and the majority impermissibly broaden Paragraph 2 beyond its plain meaning. The district court stated that

> Conoco's *reading* of [Paragraph 2] in effect allows the company to
> transfer Union-represented employees to the position of laborer, and

immediately replace them with contract workers because, from the moment of transfer and thereafter, there was no Union-represented employees with a number in the craft. Under this interpretation, the limitation imposed by [Paragraph 2] is rendered meaningless.

*Oil, Chem. & Atomic Workers Int'l Union v. Conoco, Inc.*, No. 97-CV-682-H, slip op. at 6-7 (N.D. Okla. Nov. 19, 2001) (emphasis added). It is not, however, Conoco's "reading" of the provision that allows it to do so; it is the plain language of the contract. I can discern no interpretive gloss whatsoever in Conoco's supposed "interpretation." Conoco merely reiterates the plain language of the contract, which requires that employees holding numbers in a craft be *working as laborers* when Conoco contracts work in that craft.

Nor is it accurate to say that the provision is entirely meaningless. It is *almost* meaningless. In situations where a represented employee holding a number in a craft is working elsewhere in the refinery as a laborer, and work in that craft is available, Paragraph 2 of Article 36 prohibits Conoco from hiring contractors to do it. But that is the only restriction Paragraph 2 imposes. I believe, therefore, that the district court erred in stating that "since an interpretation of Article 36 is necessary to resolve this dispute, under the express provisions of Article 31 of the Refinery Agreement the issue is for an arbitrator to decide." *Id.* at 7. The only question presented is whether the grievance arises under the plain language of Article 36. Because it clearly does not, there is no reason to remove the issue from the ambit of Article 12. Indeed, if all that is necessary for the Union to force

-3-

Conoco to arbitration is the bare allegation that a grievance arises outside of Article 12 – i.e., that it requires an "interpretation" of some other Article – there would never be any call for us to examine the contractual language, and every grievance would be *de facto* arbitrable. Whatever we may think of Paragraph 2, we simply cannot rewrite the CBA to suit ourselves.

By repeating the Union's claim that Conoco's interpretation will permit Conoco to destroy the Union by attrition, the majority appears to have made the same error as the district court. Maj. op. at 9. The Union's ostensibly more reasonable interpretation of Paragraph 2 ("so long as there are employees holding numbers in a particular craft, no contractor will work in that craft") omits any consideration whatsoever of the final three words of Paragraph 2 ("working as laborers"). These words impose a significant and unambiguous limitation on the scope of Paragraph 2, one that removes the grievances at issue from its ambit. They require no interpretation, and removing them from consideration drastically alters the plain meaning of Paragraph 2. For this reason, I disagree with the majority's statement that "competing interpretations of the second limitation in Article 36" render the relevant grievances arbitrable.

The record amply demonstrates that, from the outset, the substance of the Union's grievances under Paragraph 2 has been that Article 36 prohibits Conoco from hiring contractors to work "side by side" with Union members. However

-4-

one-sided the provision *as agreed to by the parties* may be, such an interpretation is impossible without pruning the final three words from Paragraph 2. This we may not do.

For these reasons, I respectfully dissent.