QUEEN UNO LTD. PARTNERSHIP, Douglas Giedt, David F. Fromlet, and Silview Investments Limited, on behalf of themselves and on behalf of all others similarly situated, Plaintiffs,

v.

COEUR D'ALENE MINES CORPORATION, Dennis Wheeler, James A. Sabala, and Ernst & Young LLP, Defendants.

Civil Action No. 97–WY–1431–CB.

United States District Court, D. Colorado.

April 13, 1998.

Robert J. Dyer III, Kip B. Shuman, Jeffrey A. Berens, Dyer Donnelly, Denver, Alan Schulman, Randi D. Bandman, Randall J. Baron, Amber L. Eck, Milberg Weiss Bershad Hynes & Lerach LLP, San Diego, CA, for Plaintiffs.

Robert E. Youle, Michael B. Carroll, Williams, Youle & Koenigs, P.C., Denver, CO, Alan N. Salpeter, Michele Odorizzi, Jonathan C. Medow, Mayer Brow & Platt, Chicago, IL, for Defendants Coeur d'Alene Mines Corporation, Dennis E. Wheeler and James A. Sabala.

Alan M. Loeb, Davis, Graham & Stubbs LLP, Denver, CO, Michael L. Rugen, Renata M. Sos, Heller Ehrman White & McAuliffe, San Francisco, CA, for Ernst & Young LLP.

## ORDER ON MOTION TO TRANSFER AND MOTIONS TO DISMISS

BRIMMER, District Judge, Sitting for the District of Colorado.

This matter is before the Court on Defendants Coeur D'Alene Mines Corporation's, Dennis A. Wheeler's, James A. Sabala's (the Coeur defendants), and Ernst & Young's Motions to Transfer and Motions to Dismiss. The Court FINDS and ORDERS as follows:

### Background

Defendant Coeur d'Alene Mines Corporation (Coeur) is an Idaho corporation that explores, develops, and operates silver and gold mining properties in the United States, Chile, and New Zealand. Its stock is traded on the New York and Pacific Stock Exchanges. From 1991 to 1994, Coeur suffered significant losses because of high operating costs, large interest payments, and excessive dependence on silver production. According to Plaintiffs,[1] Coeur, via its Chief Executive Officer and Chairman of the Board Defendant Dennis E. Wheeler and its Chief Financial Officer Defendant James A. Sabala, engaged in an unlawful and fraudulent "scheme" to inflate the Company's stock price, reduce its operating losses, and create a public impression that in 1995 Coeur had

---

1. These facts are taken from Plaintiffs' Amended Complaint. They are, of course, accepted by the Court as true for purposes of this motion.

returned to profitability. Plaintiffs further allege that Coeur's external auditor, Defendant Ernst & Young, LLP, was aware or should have been aware through the exercise of proper professional diligence that the 1994 and 1995 Coeur financial statements—represented by Ernst as in accordance with generally accepted accounting principles (GAAP) and generally accepted auditing standards (GAAS)—were in fact materially overstated and based on material misrepresentations and omissions.

The allegedly fraudulent scheme was premised primarily on representations made by the Coeur defendants regarding two mines: the Golden Cross Mine in New Zealand and the Fachinal Mine in Chile. Coeur purchased the Golden Cross Mine in 1993 for approximately $50 million, and soon thereafter embarked on a lengthy and heavy public promotion of the mine's bright prospects. Via press conferences, press releases, meetings with securities analysts, and other public events Wheeler and Sabala reported that Golden Cross was producing gold at a lower cost per ounce than in prior years, that production at the mine was increasing, and that these benefits would continue well past 1995. When discussing Golden Cross, the Coeur defendants frequently speculated that the mine would produce approximately 77,000 ounces of gold in 1996. In early 1996, Coeur disclosed it had became aware of deep seated ground movement at Golden Cross that was "unrelated to our operations at the mine." Coeur assured investors and analysts it had implemented procedures to halt the movement and insure stability of the mine.

The Fachinal mine was an in-house project constructed by Coeur. As with Golden Cross, the Coeur defendants made and disseminated optimistic announcements of expected production levels at the Fachinal mine. Among these statements were repeated assurances that the Fachinal mine would be completed on time and under budget in October 1995 and would begin commercial production in late 1995 and produce 41,000—45,000 ounces of gold in 1996. Coeur publicized that production from Fachinal would "significantly impact revenues and cash flow."

Other statements did not mention Golden Cross or Fachinal but referred generally to overall company performance. The Coeur defendants publicized on numerous occasions that the company expected stronger cash flow, increased net income, and higher earnings per share in 1996 and 1997. Wheeler espoused that Coeur had a "plan for sustained growth" and a "strong financial position." As a result, Coeur had experienced "a significant strengthening in the balance sheet" and was poised for "dramatic growth." Wheeler further confided to the public that Coeur "was very optimistic as we look forward from 1995 on," and assured stakeholders they "had every reason to expect a good 1996." At one meeting, Wheeler and Sabala predicted Coeur would generate $24 million of cash flow in 1996. These sentiments were characteristic of statements made by Wheeler and Sabala throughout the class period.

The perceived vitality of Coeur, reinforced by the consistent barrage of optimistic forecasts regarding Golden Cross and Fachinal as well as the Company in general, drove Coeur's common stock price from $14–1/2 per share on January 9, 1995, the beginning of the class period, to an all-time high of $25–3/4 per share on July 11, 1996, the end of the class period. The boom was short lived. On July 10, 1996, massive structural problems at Golden Cross forced Coeur to write off its $53 million investment at the mine. At the same time, Coeur admitted the Fachinal mine had suffered significant losses as a result of operational difficulties and production shortfalls.

Following this news, Coeur's stock was downgraded and its price per share plummeted to $15–1/2, a 40% decline from its class period high. By year-end 1996, Coeur's losses were massive: $54.5 million or $2.54 per share. Cash flow had fallen by over half, from $20.9 million in 1995 to $7.7 million in 1996. Coeur's customary $.15 per share common stock dividend was eliminated.

### 1. Plaintiffs' Allegations

Plaintiffs bring this action on behalf of all persons who purchased Coeur's publicly traded debt and equity securities between January 9, 1995 and July 11, 1996. They state claims against all Defendants under Section 10(b) of the Exchange Act and its

accompanying regulation Rule 10b–5, and against the Coeur defendants under Section 20(a) of the Exchange Act. Plaintiffs charge that the Coeur defendants made knowing material misrepresentations regarding the existence of structural problems with Golden Cross, the presence of construction, personnel, and production problems at Fachinal, and the negative effect these difficulties were likely to have on Coeur's balance sheet.

With respect to Golden Cross, Plaintiffs contend Coeur was aware even before it purchased the mine of significant structural and stability problems posing a substantial threat to the mine's long-term productivity. Specifically, Plaintiffs allege the Coeur defendants knew the Golden Cross mining operation was located on slipping, unstable ground that could cause—and had in fact caused—both the main tailings impoundment dam and the backup dam to fail, and further were aware that resolving these problems would require the incurrence of many millions of dollars in remediation expenses that would in turn render any significant future productive use of the mine unlikely. Furthermore, the presence of these problems made it impossible, or at least extremely unlikely, that Golden Cross was or would be producing gold at a lower cost than it had historically; that production at Golden Cross was increasing or would increase in the future; or that Golden Cross would produce the 77,000 ounces of gold in 1996 the Coeur defendants had publicly predicted.

According to Plaintiffs, the Coeur defendants put an equally evasive spin on conditions at the Fachinal mine. For example, the Coeur defendants were aware, while they were making contradictory statements, that the Fachinal mine would not be completed for commercial production purposes before the end of 1995; would remain in a pre-production stage for another year; would not in 1996 produce, as had been publicized by Coeur, 44,000 ounces of gold; was within budget only because Coeur had not purchased and installed certain equipment needed to bring the mine to full production capacity; and was saddled by management and worker deficiencies.

The Complaint further alleges that Coeur's financial statements for year-end 1994 and 1995 and quarter-end March 31, June 30, and September 30, 1995 and March 31, 1996 were in violation of GAAP and misleading and materially false because in each statement Coeur failed to accrue for losses or disclose the extreme risk of loss associated with Golden Cross. More specifically, Plaintiffs allege Coeur violated, among other rules, FASB Statement of Accounting Standard No. 5, Accounting for Contingencies, which requires losses to be accrued by a charge to income if it is probable an asset has been impaired and the amount of the loss can be reasonably estimated. Plaintiffs allege the problems at Golden Cross should have been disclosed in all these financial statements and losses incurred based on the Coeur defendants' awareness of the significant impairment of the Golden Cross asset. Plaintiffs further allege Coeur's disclosure in its 1995 10–K that it had become aware in "the fall of 1995" that Golden Cross's tailings dam "may have sustained movement," was itself misleading because Coeur had known of the problem for some time, knew the dam had in fact sustained movement, and also knew initial efforts to stop the movement had failed and that remediation costs would therefore be far in excess of the $4 million estimated for repair in the 10–K.

Plaintiffs contend Coeur's statements regarding the Company's improving balance sheet and healthy financial performance were patently misleading in light of the above facts. Indeed, while the Coeur defendants were publicly touting the virtues of the Golden Cross and Fachinal operations, they were privately aware that mounting problems at those facilities would have a dramatically negative effect on Coeur's balance sheet and on the public's perception of Coeur's financial strength. The Coeur defendants nonetheless continued to perpetrate their fraudulent scheme by representing that Coeur's balance sheet and cash flow were strong, the Company's financial condition was improving, and the sought after increase in gold production had occurred and would continue to escalate.

The benefits of this scheme were realized throughout the class period. For example, Coeur utilized its perceived financial health to initiate and complete a balance-sheet-strengthening $150 million convertible securi-

ties offering, to acquire interests in other mining properties, to improve ratings for its corporate credit and subordinated debt, and to force conversion of its outstanding 7% convertible debentures into Coeur common stock on less dilutive terms than would have been available had the stock price not soared. Based largely on Coeur's strong and improving performance, Wheeler and Sabala received hefty bonuses at the end of both 1994 and 1995.

After these benefits had accrued, Coeur terminated the scheme by revealing what Plaintiffs claim the Coeur defendants had known and expected all along: that Golden Cross's structural problems were so severe as to virtually assure Coeur would have to write off its $53 million investment in the mine; that gold production at Golden Cross had decreased by 40% and that the promised levels of gold production therefore would not be realized; and that because of operation and personnel difficulties the Fachinal mine in 1996 had never reached commercial production, had produced only 25,000 ounces of gold, and was burdened by a $7 million cash flow deficit.

Plaintiffs further allege Coeur's independent auditor, Ernst & Young, knowingly or recklessly misrepresented that Coeur's 1994 and 1995 financial statements and 10-Ks fairly presented Coeur's financial condition in conformity with GAAP and that E & Y had conducted its audits in accordance with GAAS. In this respect, Plaintiffs contend E & Y's desire to retain Coeur as a client motivated E & Y to ignore certain facts which it purportedly was or should have been aware of given its access to Coeur's internal sources. This confidential corporate and business information would have alerted E & Y to the following "red flags:" (1) Coeur had paid double other bidders for its interest in Golden Cross; (2) one of Coeur's directors resigned in 1993 because of objections to the Golden Cross acquisition; (3) Coeur had spent millions of dollars on remedial measures at Golden Cross; and (4) Golden Cross was one of Coeur's most vital assets. By ignoring these "facts," E & Y in effect permitted Coeur to grossly overstate its profits in its 1994 and 1995 financial statements, and in the process committed a host of GAAP and GAAS violations.

In any event, as a result of Coeur's revelations, its stock price fell, and its investors, including Plaintiffs, lost money. Thus this lawsuit.

**2. Defendants' Response**

The Coeur defendants deny Plaintiffs' allegations, and specifically assert that if the statements in hindsight appear overly optimistic, they in no sense were knowingly fraudulent when made. Ernst & Young similarly denies any allegations of fraudulent or reckless behavior, and claims its audits were conducted in good faith and in accordance with applicable professional standards. All Defendants ask the Court to transfer venue, or, in the alternative, dismiss Plaintiffs' Amended Complaint on the ground that it does not satisfy the heightened pleading standards set forth in Federal Rule of Civil Procedure 9(b) and the Private Securities Litigation Reform Act of 1995.

### *Motions to Transfer*

Defendants assert two grounds in asking the Court to transfer venue to the District of Idaho. First, they argue venue is not proper in Colorado under Section 27(a) of the Exchange Act. Second, they argue if venue is technically proper in Colorado, transfer is appropriate under 28 U.S.C. § 1404(a) on grounds of convenience and justice. The Court will consider these arguments in turn.

Section 27 of the Exchange Act, codified at 15 U.S.C. § 78aa, explains venue is proper in any district where "the defendant is found or is an inhabitant or transacts business," or, alternatively, where "any act or transaction constituting the violation occurred." This broad venue provision was intended to grant plaintiffs liberal choice in selecting a forum. *See Sohns v. Dahl,* 392 F.Supp. 1208, 1215 (W.D.Va.1975).

Plaintiffs do not, and given the facts could not, assert that Coeur is an inhabitant of or transacts business in Colorado. They instead argue venue is proper because an act or transaction relating to the violation—the sale of Golden Cross to Coeur from Cyprus—occurred in Colorado. Defendants argue there must exist some logical nexus between the forum and the alleged unlawful act, and

submit the sole Colorado connection, the purchase of Golden Cross in Colorado, is insufficient in this respect.

■ The Court finds venue is proper in Colorado. Contrary to Defendants' argument, it is not necessary that the alleged wrongdoing have been committed in Colorado. It is instead sufficient if any act in furtherance of the unlawful scheme was committed in this District. *See Wharton v. Roth*, 263 F.Supp. 922, 923 (E.D.N.Y.1964) ("It is only necessary to show that an act in furtherance of the unlawful plan was committed within the district to sustain venue."). This act need not constitute the core act of the illegal scheme nor even be crucial to the scheme's success or failure. *See Hilgeman v. National Ins. Co.*, 547 F.2d 298, 301 (5th Cir.1977). It need only be more than a trivial and immaterial component of the wrongful conduct. *See id.; S–G Securities, Inc. v. Fuqua Inv. Co.*, 466 F.Supp. 1114, 1121 (D.Mass.1978).

Here, Plaintiffs allege Defendants purchased, in Colorado, the Golden Cross mine with knowledge of structural defects in the mining operation so serious as to render it probable that the mine would be of limited long-term value and require the incurrence of massive remediation expenses. According to Plaintiffs, this purchase was the first step in and the foundation of a scheme to defraud investors and artificially inflate Coeur's stock price. Thus, the purchase of Golden Cross was a material component of the allegedly fraudulent scheme. Venue in this District is therefore appropriate under 15 U.S.C. § 78aa. *See Lefever v. Vickers*, 613 F.Supp. 352, 353 (D.Colo.1985) (act committed in District in which venue is sought need not have been illegal as long as it was more than immaterial to scheme); *Sohns*, 392 F.Supp. at 1215 (noting courts "have sustained plaintiff's choice of venue even though based on only one act or acts peripheral to the alleged violation").

■ Even if venue is proper, 28 U.S.C. § 1404(a) nonetheless permits a district court to transfer the case to another district if the court determines such a transfer would be convenient for the parties and witnesses or in the interests of justice. Although the decision to transfer is made on a case-by-case basis, the Tenth Circuit has delineated several factors that may prove useful in this determination: (1) the plaintiff's choice of forum; (2) the accessibility of witnesses and other sources of proof, including the availability of compulsory process to insure attendance of witnesses; (3) the cost of making the necessary proof; (4) questions as to the enforceability of a judgment if one is obtained; (5) relative advantages and obstacles to a fair trial; (6) difficulties that may arise from congested dockets; (7) the possibility of conflict of laws issues; (8) the advantage of having a local court determine questions of law; and (9) all other considerations of a practical nature that make a trial easy, expeditious, and economical. *See Chrysler Credit Corp. v. Country Chrysler, Inc.*, 928 F.2d 1509, 1516 (10th Cir.1991); *Texas Gulf Sulphur Co. v. Ritter*, 371 F.2d 145, 147 (10th Cir.1967). The parties seeking the transfer, Defendants in this instance, bear the burden of establishing the inconvenience of the existing forum. *See Chrysler Credit Corp.*, 928 F.2d at 1515. Furthermore, "unless the balance is strongly in favor of the movant the plaintiff's choice of forum should rarely be disturbed." *See Scheidt v. Klein*, 956 F.2d 963, 965 (10th Cir.1992).

■ Defendants have failed to establish that the forum is sufficiently inconvenient and the interests of justice so heavily in their favor that transfer should occur. Defendants primarily argue the parties and witnesses are more closely connected with Idaho than Colorado and thus that a trial in Colorado would impose upon these individuals a substantial inconvenience. The record before the Court does not support this argument. Only Coeur and its employees—a minority of witnesses— are located in Idaho. Those Ernst and Young employees likely to testify work in the firm's Seattle office. Other likely witnesses are found not in Idaho but nation- and worldwide, in such geographically dispersed places as New Zealand and Chile. For these witnesses, the ease of accessibility to Colorado as compared to Idaho renders this District a more convenient forum. Finally, Cyprus AMAX, the company that sold Golden Cross to Coeur, is located in Colorado. Given that disclosures relating to the sale of Golden Cross form the basis of Plaintiffs' complaint,

the availability of the compulsory process to insure attendance of Cyprus's employees' is alone a sufficient reason for denying Defendants' Motions. *See generally Knapp v. Romer,* 909 F.Supp. 810 (D.Colo.1995).

Furthermore, the Court finds there are substantial obstacles to Plaintiffs' ability to obtain a fair trial in Idaho. The court to which Plaintiffs seek transfer sits in the town of Coeur d'Alene, located in the same area in which Defendant Coeur has a principal place of business. Thus, many potential jury members may be biased against Plaintiffs and in favor of Coeur, a local company and major employer for area citizens.

In short, Defendants ask the Court to transfer the case to a forum that is convenient only for them and that will grant them a jury pool from which they likely will draw highly favorable, if not outright unfairly bi-ased, jurors. These grounds are nothing more than superficial counterfeits designed to gain Defendants an unfair "home-field advantage." Because Defendants have not met their burden of establishing that Colorado is an inconvenient forum for the majority of witnesses, and because in any event the interests of justice mandate that the case not be transferred to the District of Idaho, the Court denies Defendants' Motions to Transfer.

### Motions to Dismiss

### A. Standard of Review

Dismissal pursuant to Federal Rule of Civil Procedure 12(b)(6) is rarely appropriate and should occur only if it appears a plaintiff can prove no set of facts in support of the claims that would entitle the plaintiff to relief. *See Grossman v. Novell, Inc.,* 120 F.3d 1112, 1118 (10th Cir.1997). In considering such a motion, the Court must, of course, accept as true all the plaintiff's well-pled factual allegations and construe them in a light most favorable to the plaintiff. *See Maez v. Mountain States Tel. & Tel., Inc.,* 54 F.3d 1488, 1496 (10th Cir.1995). Although the fact-specific inquiries common to securities cases generally preclude dismissal, courts will nonetheless grant a defendant's 12(b)(6) motion if the alleged misrepresentations or omissions are immaterial or not pled in accordance with Federal Rule of Civil Procedure 9(b) or the Private Securities Litigation Reform Act. *See Grossman,* 120 F.3d at 1118. Dismissal is not appropriate, however, merely because a Court disbelieves a complaint's factual allegations. *See Neitzke v. Williams,* 490 U.S. 319, 327, 109 S.Ct. 1827, 104 L.Ed.2d 338 (1989); *Northington v. Jackson,* 973 F.2d 1518, 1522 (10th Cir.1992).

### B. Section 10(b) and the Private Securities Litigation Reform Act

Section 10(b) makes it unlawful for any person "[t]o use or employ, in connection with the purchase or sale of any security ... any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors." 15 U.S.C. § 78j(b). One rule prescribed by the SEC under this section is Rule 10b–5, which declares it unlawful for a person "to make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading." 17 C.F.R. § 240.10b–5 (1997). To state a valid 10b–5 claim, a plaintiff must allege the defendant: (1) in connection with the purchase or sale of a security; (2) made an untrue statement of material fact or failed to state a material fact; (3) with scienter; and (4) the plaintiff relied on the misrepresentation and sustained damages as a proximate result of the misrepresentation. *See Anixter v. Home–Stake Prod.,* 77 F.3d 1215, 1225 (10th Cir.1996).

Because 10b–5 claims by necessity involve allegations of fraudulent conduct, courts have long required that they be pled in accordance with Federal Rule of Civil Procedure 9(b). That rule provides in pertinent part that in "all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity. Malice, intent, knowledge, and other condition of mind of a person may be averred generally." Notwithstanding the Tenth Circuit's strict enforcement of Rule 9(b)'s particularity requirement, district courts considering the sufficiency of a complaint under Rule 9(b) have been directed to bear in mind the dual

purposes the rule was designed to serve. *See Farlow v. Peat, Marwick, Mitchell & Co.,* 956 F.2d 982, 986–87 (10th Cir.1992); *Schwartz v. Celestial Seasonings, Inc.,* 124 F.3d 1246, 1252 (10th Cir.1997). First, the rule was intended to afford a defendant fair notice of a plaintiff's claims and the factual grounds upon which those claims rest. *See Farlow,* 956 F.2d at 986–87. Second, the rule was designed to safeguard a defendant's reputation from irreparable damage due to improvident charges of wrongdoing. *Id.*

Skeptical of Rule 9(b)'s ability to fulfill these purposes, Congress in 1995 amended the Securities Exchange Act of 1934 by enacting the Private Securities Litigation Reform Act. The Reform Act was designed to deter perceived abuses of the Exchange Act by overzealous attorneys intending not to right a securities fraud wrong, but to make a quick buck by coaxing settlements out of well-intentioned companies and executives fearful of a large but unwarranted jury verdict. *See generally* Senate Report No. 104–98, *reprinted in* 1995 U.S.C.C.A.N. 679. It substantially modified, among other things, the standard for pleading securities fraud claims. Now, to adequately plead a 10b–5 claim a plaintiff not only must plead with particularity the facts constituting fraud, but also must plead with particularity facts permitting a strong inference that the respective defendant acted with the required state of mind. *See* 15 U.S.C. § 78u–4(b)(1) & (2). Thus, there are two broad inquiries facing a court considering a motion to dismiss a securities fraud claim governed by the Reform Act amendments: first, a defendant may challenge the particularity of allegations regarding the false or misleading statements; and second, a defendant may challenge whether the particularly stated allegations give rise to a strong inference of the required state of mind.

### C. Analysis

#### 1. Particularity of False and Misleading Statements

The Reform Act requires a plaintiff's complaint to "specify each statement alleged to have been misleading [and] the reason or reasons why the statement is misleading." 15 U.S.C. § 78u–4(b)(1). If the complaint is pled on information and belief, it must "state with particularity all facts on which that belief is formed." *Id.* Section 78u–4(b)(1) did not—at least with respect to this Circuit— alter drastically, if at all, the standards for pleading false and misleading statements or for pleading based on information and belief. Indeed, even before the Reform Act was passed, it was settled Tenth Circuit law that a plaintiff satisfied Rule 9(b)'s particularity requirement only by stating what was false or misleading about the statement and explaining why the statement or omission complained of was false or misleading. *See Grossman,* 120 F.3d at 1124; *Farlow,* 956 F.2d at 986. Likewise, a complaint pled on information and belief was sufficient only if it included "a statement of the facts on which the belief [was] based." *Lochhead v. Alacano,* 697 F.Supp. 406, 416 (D.Utah 1988); *see Scheidt,* 956 F.2d at 967. Because § 78u–4(b)(1) therefore appears in large part to be merely a codification of pre-existing Tenth Circuit law, the Court will consider pre-Reform Act decisions from the Tenth Circuit in determining whether Plaintiffs' Amended Complaint is pled with sufficient particularity.

■ As a preliminary matter, the Court must determine whether Plaintiffs' Complaint is pled on information and belief. In this respect, ¶ 129 of the Complaint provides in relevant part:

> [P]laintiffs have alleged the foregoing based upon the investigation of their counsel, which included a review of Coeur d'Alene's SEC filings, securities analysts' reports and advisories about the Company, press releases issued by the Company, media reports about the Company, private investigations, and discussions with consultants, and, pursuant to Rule 11(b)(3), believe that after reasonable opportunity for discovery, substantial evidence will likely exist for the allegations set forth in [the Complaint].

Defendants cite *In re Silicon Graphics, Inc. Securities Litigation,* 970 F.Supp. 746, 763 (N.D.Cal.1997) (hereafter "Silicon Graphics"), in arguing that because sources like those contained in ¶ 129 do not provide plaintiffs with "personal knowledge," the complaint logically must be pled on information and belief. At least three other courts, however, have construed allegations virtually

identical to those found in ¶ 129 as not pled on information and belief, but as setting forth detailed allegations of fraud based on, among other things, the investigation of counsel. *See Zeid v. Kimberley*, 973 F.Supp. 910, 915 (N.D.Cal.1997); *Howard Gunty Profit Sharing v. Quantum Corp.*, No. 96–20711–SW, 1997 WL 514993, at *3 (N.D.Cal.1997); *Cherednichenko v. Ouarterdeck Corp.*, No. 97–CV–4320–GHK, at p. 3 n. 3 (C.D.Cal. Nov. 26, 1997). For example, in *Zeid* the court observed that although "some of the facts appear to be peculiarly within Defendants' knowledge, Plaintiffs contend that they have, through investigation, acquired sufficient facts to state a claim for fraud without relying on allegations made on information and belief." 973 F.Supp. at 915. So it is here. Although Plaintiffs could have stated they were seeking to plead on information and belief, and consequently sought entitlement to an assumed relaxation of the Reform Act's particularity requirements, they have not done so.[2] They must, therefore, state with particularity "each statement alleged to have been misleading [and] the reason or reasons why the statement is misleading." 15 U.S.C. § 78u–4(b)(1); *see Zeid*, 973 F.Supp. at 915; *Howard Gunty Profit Sharing*, 1997 WL 514993, at *3.

██ The Court finds Plaintiffs' allegations, as set forth above, sufficiently particular to satisfy Rule 9(b) and the Reform Act. The allegations described by the Court are only a sampling of the allegations against the Coeur defendants contained in the Plaintiffs' 108 page Complaint.[3] And while some of the allegations may certainly be classified as mere puffing or inactionable statements of corporate optimism, numerous others—such as those regarding the exact amount of anticipated production at a particular mine or the specific amount of expected net income per share—are concrete and capable of objective verification. *Cf. Grossman*, 120 F.3d at 1119. The allegations against the Coeur defendants specify the exact substance of the representations made by those defendants, the person or entity that made the statements, the medium by which the statements were made, the date on which they were made, the facts the Coeur defendants failed to disclose, and the particular reasons why the statements were either false or misleading at the time they were made. Neither Rule 9(b) nor the Reform Act requires that Plaintiffs do more. *See Powers v. Eichen*, 977 F.Supp. 1031, 1037–38 (S.D.Cal.1997) (complaint satisfies 9(b) and Reform Act if it indicates each alleged misstatement and gives reasons why statement was misleading); *Fugman v. Aprogenex, Inc.*, 961 F.Supp. 1190, 1194–95 (N.D.Ill.1997); *see also Schwartz*, 124 F.3d at 1252–55.[4]

**2.** Before the Reform Act was passed, courts in many circuits relaxed Rule 9(b)'s particularity requirement when the complaint was pled on information and belief. *See, e.g., Lochhead*, 697 F.Supp. at 415–16. This Court questions, but does not decide, whether such relaxation is appropriate in light of § 78u–4(b)(1)'s directive that complaints pled on information and belief state with particularity all facts on which the allegations are based.

**3.** While the Complaint was thorough, it was also unnecessarily repetitive, as if Plaintiffs thought their claims could be proven by dint of sheer repetition. The Court gave serious consideration to dismissing the Complaint for failure to comply with Federal Rule of Civil Procedure 8(a), which requires that a complaint set forth a "short and plain statement of the claim." That the Court did not do so should not be interpreted by Plaintiffs as leave to file throughout the course of these proceedings other ridiculously long and rambling pleadings, motions, or briefs.

**4.** Even were the Court to consider the Complaint as pled on information and belief, there is a strong argument that the allegations would nonetheless be sufficient under the Reform Act, which requires only that an information and belief complaint "state with particularity all facts on which that belief is formed." Moreover, while the Court agrees with *Silicon Graphics* that if plaintiffs pleading a complaint based on information and belief have in their possession internal documents or information obtained from confidential informants, then they must identify specific facts regarding the documents and set forth the names of and information provided by the informants, the Court disagrees with *Silicon Graphics* to the extent that court held that a complaint pled on information and belief *must* include such information to withstand a motion to dismiss. In other words, the Court here does not read § 78u–4(b)(1) or its legislative history as meaning that an information and belief claim can be properly pled only if plaintiffs have such information; rather, § 78u–4(b)(1) merely requires that if plaintiffs do in fact have such information it must be set forth with particularity in their complaint. This reading satisfies the apparent Congressional objective of ensuring early disclosure by plaintiffs of all factual bases for their claims (which in turn provides defendants substantial information with

The Court concedes the allegations against Ernst & Young are not pled with the same level of detail, and that it is a close question whether those allegations are sufficiently particular to satisfy Rule 9(b). Nonetheless, the Court believes E & Y can discern from the allegations what role in the alleged scheme Plaintiffs claim E & Y had, and that the allegations, although only barely, set forth the "who, what, when, where, and how," of E & Y's knowing or reckless behavior. *See Farlow,* 956 F.2d at 986 (discussing Rule 9(b) requirements).

### 2. Scienter

The Reform Act's most significant modification was its heightening of the standard for pleading scienter. As noted above, before enactment of the Reform Act plaintiffs were permitted under Rule 9(b) to aver generally "knowledge and other condition of mind of a person." *See e.g., In re Exabyte Corp. Securities Litigation,* 823 F.Supp. 866, 869 (D.Colo.1993). Not surprisingly, a split of authority developed in the circuits as to what level of generality was sufficient. *See Silicon Graphics,* 970 F.Supp. at 755 (citing cases). The most stringent of the pleading requirements was the Second Circuit's, which required a plaintiff to plead facts giving rise to a "strong inference of fraudulent intent." *See Rehm v. Eagle Finance Corp.,* 954 F.Supp. 1246, 1251 (N.D.Ill.1997). Given Congress's dual intentions of interposing a sense of uniformity among the circuits on this issue and simultaneously strengthening securities fraud pleading requirements, it is not surprising that the strong inference language appears in the Reform Act. Specifically, the Reform Act requires that "the complaint, with respect to each act or omission alleged to violate this chapter, state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u–4(b)(2). Before the Court can apply this standard to the instant facts, however, it must determine what state of mind is required and what type of pleaded facts will give rise to a "strong inference" of the re-

quired scienter. The Court will consider these issues in turn.

### (i) State of Mind

 The required state of mind is dependent upon the type of statement made by the defendant. Statements that satisfy the statutory definition of "forward-looking" are subject to the Reform Act's safe harbor provision. *See* 15 U.S.C. § 78u–5. A "forward-looking" statement includes, among other things, any statement containing a projection of revenues, income, earnings per share, capital expenditures, dividends, capital structure or other financial items; any statement of the plans and objectives of management for future operations; and any statement of future economic performance. *See* 15 U.S.C. § 78u–5(i)(1). Despite these seemingly broad categories, the safe harbor explicitly excludes from protection forward-looking statements included in financial statements prepared in accordance with GAAP; statements contained in registration statements; or statements made in connection with a tender offer or initial public offering. *See* 15 U.S.C. § 78u–5(b)(2).

The safe harbor provision—like the common law "bespeaks caution" doctrine—insulates a defendant from liability for forward-looking statements if the statement is identified as a forward-looking statement, and "is accompanied by meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the forward-looking statements." 15 U.S.C. § 78u–5(c)(1)(A). If the forward looking statement is oral, it is similarly insulated provided it either: (1) is accompanied by a cautionary statement specifying first that the particular oral statement is a forward-looking statement and second that the "actual results might differ materially from those projected in the forward-looking statement;" or (2) is accompanied by an oral statement expressing that "additional information concerning factors that could cause actual results to materially differ from those in the forward-looking statement is

which to craft a response), and at the same time recognizes that plaintiffs' access to most of a

defendant's internal sources is limited.

contained in a readily available written document." 15 U.S.C. § 78u–5(c)(2)(B).

In addition, the safe harbor protects forward-looking statements not accompanied by the requisite cautionary statements by imposing upon plaintiffs a higher scienter standard. Section 78u–5(c)(1)(B) provides that a forward-looking statement, written or oral, may not be the basis for liability unless the plaintiff proves the statement "was made with actual knowledge ... that it was false or misleading." Thus, a defendant making a forward looking statement is insulated from liability unless the defendant fails to make accompanying cautionary statements or the plaintiff proves the defendant actually knew the statement was false when made. *See In re ValuJet, Inc., Securities Litigation,* 984 F.Supp. 1472, 1479 (N.D.Ga.1997); *Gross v. Medaphis Corp.,* 977 F.Supp. 1463, 1472–73 (N.D.Ga.1997); *see also Hockey v. Medhekar,* No. C–96–0815, 1997 WL 203704 (N.D.Cal. 1997).

The Reform Act does not specify what state of mind is required with respect to non-forward-looking statements or forward-looking statements excluded from safe harbor protection. Prior to the Reform Act, most circuits, including this one, considered the scienter requirement satisfied by allegations of knowing or reckless conduct. *See O'Connor v. R.F. Lafferty & Co.,* 965 F.2d 893, 899 (10th Cir.1992). Recklessness in private securities fraud actions is not, however, mere carelessness or even gross negligence; it instead embraces a "conscious state of mind that is inherently deceptive." *In re Baesa Securities Litigation,* 969 F.Supp. 238, 241 (S.D.N.Y.1997). The Tenth Circuit has defined this type of reckless behavior as conduct that is "an extreme departure from the standards of ordinary care, and which presents a danger of misleading buyers or sellers that is either known to the defendant or so obvious that the actor must have been aware of it." *See O'Connor,* 965 F.2d at 899; *Board of County Comm'rs v. Liberty Group,* 965 F.2d 879, 883 n. 2 (10th Cir.1992).

There is little indication that Congress intended via the Reform Act to alter securities fraud liability for this type of reckless conduct. Although in specific instances the Reform Act does alter the mental state requirement, those alterations generally are limited to forward-looking statements subject to the safe harbor provision. That Congress explicitly altered the scienter requirement to exclude reckless conduct in § 78u–5(c) and did not explicitly do so in § 78u–4(b) suggests, at the least, that Congress did not intend to abolish recklessness as a state of mind sufficient to satisfy 10b–5's scienter requirement. *See Marksman Partners, L.P. v. Chantal Pharm. Corp.,* 927 F.Supp. 1297, 1309 n. 9 (C.D.Cal.1996). The Court concedes—as have others—that the legislative history indicates "some ambivalence on the part of Congress regarding recklessness liability" in securities cases. *Id.* Like most of those courts, this Court is unwilling to interpose a heightened level of scienter based on ambiguous legislative history when Congress itself apparently could not garner the support to impose such a standard in the language of the statute. *See Epstein v. Itron, Inc.,* 993 F.Supp. 1314, 1320 (E.D.Wash.1998) ("Had Congress intended to impose [a uniform state of mind] requirement, it clearly knew how to do so."); *In re Baesa Securities Litigation,* 969 F.Supp. at 241. Therefore, the Court finds that for non-forward-looking statements and forward-looking statements not insulated by the safe harbor provision, conscious recklessness, as defined above, continues to satisfy Rule 10b–5's scienter requirement. *See Novak v. Kasaks,* 997 F.Supp. 425, 430 (S.D.N.Y.1998); *In re Glenayre Technologies, Inc., Securities Litigation,* 982 F.Supp. 294, 298 (S.D.N.Y.1997); *Silicon Graphics,* 970 F.Supp. 746, 757 (N.D.Cal. 1997) (knowing or intentional misconduct includes deliberate recklessness); *In re Health Management, Inc. Securities Litigation,* 970 F.Supp. 192, 201 (E.D.N.Y.1997); *In re Baesa Securities Litigation,* 969 F.Supp. at 241; *but see Friedberg v. Discreet Logic,* 959 F.Supp. 42, 49 n. 2 (D.Mass.1997).

Not surprisingly, the parties are in disagreement over which, if any, of the Coeur defendants' statements are forward-looking.[5]

5. E & Y does not dispute that all misrepresentations allegedly made by it are not forward-looking statements.

Specifically, the Coeur defendants contend all predictions of future company performance as well as the allegedly false statements about Fachinal and Golden Cross's future production levels clearly fall within the ambit of 15 U.S.C. § 78u–5(i)(1), which defines forward-looking statements. The Court agrees that general statements of company expectations undoubtedly fall within the safe harbor provision, to the extent they are actionable at all. It is less certain whether particular and detailed representations regarding the expected production levels of specific facilities is a "statement of the plans and objectives of management for future operations," *see* 15 U.S.C. § 78u–5(i)(1)(B), and thus considered a forward-looking statement, or instead whether such representations are merely false statements of existing fact, as alleged by Plaintiffs. For purposes of this motion, and subject to later consideration upon more exhaustive briefing, the Court will consider such "hard" projections to be forward-looking statements as defined in 15 U.S.C. § 78u–5(i)(1)(B).

The Court also rejects Plaintiffs' separate argument that even if the statements are forward-looking, they are not within the scope of the safe harbor because they were made or issued before enactment of the Reform Act. Section 108 of the Reform Act specifies: "The Amendments made by this title shall not affect or apply to actions under title I of the Securities Exchange Act of 1934 . . . commenced before and pending on the date of enactment of this act [December 22, 1995]." Thus, the plain language of the Act unambiguously conveys that it applies to every action filed after December 22, 1995, regardless of when the conduct that led to the action occurred. Because this case was filed after December 22, 1995, the Reform Act amendments govern. *See Zeid,* 973 F.Supp. at 914; *Silicon Graphics,* 970 F.Supp. at 753–54.

**(ii) Strong Inference**

■ As noted, the Reform Act requires that Plaintiffs "plead with particularity facts giving rise to a strong inference that the defendant[s] acted with the required state of mind." 15 U.S.C. § 78u–4(b)(2). Unfortunately, nowhere did the Act suggest what type or quantum of facts is sufficient to raise

the required "strong inference." And, although some guidance can be gleaned from the legislative history, even that is sufficiently ambiguous and contradictory to permit opposing, but equally supported and reasonable, conclusions.

It is undisputed the "strong inference" language is drawn from the Second Circuit, which before passage of the Reform Act imposed the most stringent scienter pleading requirement of all the circuits by demanding that plaintiffs plead facts "giving rise to a strong inference of scienter." *See San Leandro Emergency Med. Group Profit Sharing Plan v. Philip Morris,* 75 F.3d 801, 813 (2d Cir.1996). The Second Circuit considered this strong inference raised when a plaintiff alleged: (1) facts showing that the defendants had both motive and opportunity to commit fraud; or (2) facts constituting strong circumstantial evidence of reckless or conscious behavior. *See id.* What is disputed is whether Congress intended to adopt the Second Circuit approach wholesale, or intended to abolish the motive and opportunity prong of the Second Circuit test in favor of a more stringent pleading requirement. Courts, with good reason, are split on this issue.

The Conference Committee Report on the Reform Act admits the "strong inference" language is "based in part on the pleading standard of the Second Circuit." House Conference Report No. 104–369, Joint Explanatory Statement of the Committee of Conference, *reprinted in* 1995 U.S.C.C.A.N. 679, at 730, 740 (Conference Report). The Report cautioned, however, that "because the Conference Committee intends to strengthen existing pleading requirements, it does not intend to codify the Second Circuit's case law interpreting this pleading standard." *Id.* Footnoted to this statement is the following: "For this reason, the Conference Report chose not to include in the pleading standard certain language relating to motive, opportunity, and recklessness." *Id.* at 747 n. 23.

A separate report issued by the Senate Committee on Banking, Housing, and Urban Affairs was not so unequivocal. *See* Senate Report No. 104–98, *reprinted in* 1995 U.S.C.C.A.N. 679. It proclaimed: "The Committee does not adopt a new and untest-

ed pleading standard that would generate additional litigation. Instead, the Committee chose a uniform standard modeled upon the pleading standard of the Second Circuit. Regarded as the most stringent pleading standard, the Second Circuit requires that the plaintiff plead facts that give rise to a 'strong inference' of defendant's fraudulent intent. The Committee does not intend to codify the Second Circuit caselaw interpreting this pleading standard, although courts may find this body of law instructive." *Id.* at 694. Thus, while in one breath Congress purported not to codify the Second Circuit standard, it in the next breath encouraged courts to look to that "instructive" caselaw.

Courts predictably have seized on both these reports, or occasionally have simply ignored them, in analyzing the vitality of the motive and opportunity prong. One of the first decisions rejecting the motive and opportunity prong was *In re Silicon Graphics, Inc., Securities Litigation,* No. C–96–0393, 1996 WL 664639 (N.D.Cal.1996). *See also In re Silicon Graphics, Inc., Securities Litigation,* 970 F.Supp. 746 (N.D.Cal.1997). That court found persuasive the Conference Committee's apparent rejection of the motive and opportunity prong; the same committee's rejection of a Senate bill that would have codified verbatim the Second Circuit's test; and Congress's override of President Clinton's veto despite the President's protestations that it was "crystal clear" the Committee intended to raise the scienter pleading standard beyond the Second Circuit's already stringent standard. *See Silicon Graphics,* at *5–6. The seemingly inordinate weight given the Conference Committee Report in *Silicon Graphics* is supported by Supreme Court instruction that the "authoritative source for finding the Legislature's intent lies in the Committee reports on the bill, which represent the considered and collective understanding of those Congressmen involved in drafting and studying proposed legislation." *See id.* at *5 (quoting *Garcia v. United States,* 469 U.S. 70, 76, 105 S.Ct. 479, 83 L.Ed.2d 472 (1984)). Several courts have, in turn, adopted the position taken in *Silicon Graphics. See Novak,* 997 F.Supp. at 429; *In re Glenayre Technologies, Inc., Securities Litigation,* 982 F.Supp. at 298; *Powers,* 977

F.Supp. at 1039; *Voit v. Wonderware Corp.,* 977 F.Supp. 363, 373–74 (E.D.Pa.1997); *Friedberg,* 959 F.Supp. at 48–50.

Others courts have rejected this "ambivalent" legislative history, and for a number of reasons affirmed the vitality of the motive and opportunity test. In *Marksman Partners, L.P. v. Chantal Pharm. Corp.,* for example, the court considered it reasonable to assume that because Second Circuit jurisprudence, including the motive and opportunity prong, had previously imposed the most stringent pleading requirements it necessarily came closest to approximating the Reform Act's standards. 927 F.Supp. at 1310. That court was decidedly "unimpressed with ... oblique reference[s] ... in a footnote to the Conference Committee Report," and acknowledged it had little doubt "that when Congress wishes to supplant a judicially-created rule it knows how to do so explicitly, and in the body of a statute." *Id.* at 1311. In *Rehm v. Eagle Finance Corp.,* a different court proffered three factors militating in favor of the *Marksman Partners* result. 954 F.Supp. at 1246. First was the Reform Act's usage of the "strong inference" language, which mirrored the pre-Reform Act standard employed by the Second Circuit. Second was the acknowledgment in the legislative history that the Reform Act was "modeled" on Second Circuit caselaw. Third was the court's belief that adoption of the Second Circuit standard adequately reconciled the conflicting policy concerns underlying the act, namely and respectively Congress's intent to heighten pleading requirements and the opposing necessity to secure the broad remedial purposes served by the federal securities laws. *Id.* at 1252. Numerous courts have employed similar reasoning in adopting the Second Circuit test, or have simply adopted that test without lengthy discussion of Congressional intent. *See, e.g., Fugman,* 961 F.Supp. at 1195; *Partners v. Sensormatic Elec.,* No. 96–C–4072, 1997 WL 570771 (N.D.Ill.1997); *In re Oak Tech. Securities Litigation,* No. 96–20552, 1997 WL 448168 (N.D.Cal.1997); *Shahzad v. H.J. Meyers & Co.,* No. 95–Civ–6196, 1997 WL 47817 (S.D.N.Y.1997).

Finally, a few cases chart a course between outright rejection and wholesale adoption of the motive and opportunity prong of the Second Circuit standard. For example, in *In re Baesa Securities Litigation* the court noted it followed "from the plain language of the statute that the mere pleading of motive and opportunity does not, of itself, automatically suffice to raise a strong inference of scienter. This, of course, does not mean that particulars regarding motive and opportunity may not be relevant to pleading circumstances from which a strong inference of fraudulent scienter may be inferred. In some cases, they may even be sufficient by themselves to do so. But, under the Reform Act, and in contrast to prior Second Circuit precedent, they are not presumed sufficient to do so." 969 F.Supp. at 242. *In re Health Management, Inc. Securities Litigation,* while disagreeing with what it believed to be *In re Baesa's* unconditional repudiation of the motive and opportunity prong, followed similar reasoning in framing the issue as not whether a particular pre-Reform Act standard was satisfied, but whether the allegations, regardless of whether they were characterized as motive and opportunity allegations or conscious behavior allegations, gave rise to a strong inference of fraudulent intent. *See* 970 F.Supp. at 201. The court explained, "Congress intended the courts to determine whether a plaintiff has pled a 'strong inference' of fraudulent intent by examining the particular allegations of each case. A plaintiff can satisfy this burden by pleading motive and opportunity, conscious misbehavior, reckless-ness[,] or by impressing upon the Court a novel legal theory." *Id.*

Here, the Court finds such a case-by-case approach most appropriate in light of the plain language and legislative history of the Reform Act. Congress's unequivocal intention, as noted in both reports, to "raise existing pleading requirements" precludes a per se rule that allegations of motive and opportunity necessarily raise a strong inference that the defendants acted with the required state of mind. This does not mean that in occasional cases the inference drawn solely from motive and opportunity allegations will

not be sufficiently strong to withstand a motion to dismiss, but merely that it will not always be so. *See In re Baesa Securities Litigation,* 969 F.Supp. at 242. Moreover, in those cases where motive and opportunity allegations do not alone create a strong inference of scienter, the allegations will nonetheless be relevant in determining whether the totality of the allegations permits a strong inference of fraud. *See In re Glenayre Technologies, Inc., Securities Litigation,* 982 F.Supp. at 294; *In re Baesa Securities Litigation,* 969 F.Supp. at 242. In short, the Reform Act requires that a court examine a plaintiff's allegations in their entirety, without regard to whether those allegations fall within a formalistic category such as motive and opportunity, to determine if the allegations permit a strong inference of fraudulent intent. If the facts alleged permit such an inference then a 10b-5 claim will by the Reform Act's plain language survive a motion to dismiss.

### (iii) The Coeur Defendants

■ The Court finds the Plaintiffs' particularized allegations raise a strong inference that the Coeur defendants acted with the required state of mind, be it actual knowledge or recklessness. Throughout the class period, the Coeur defendants made numerous representations regarding specific current and expected production levels at the Golden Cross and Fachinal mines. As discussed infra, Plaintiffs describe in detail circumstances that strongly suggest these statements were purposefully made misrepresentations (or recklessly made misrepresentations in the case of non-forward looking representations such as the financial statements) designed to inflate the value of Coeur's stock and in turn permit Coeur to complete a $150 million convertible securities offering, acquire interests in other mining companies, improve ratings for its corporate debt, and convert outstanding 7% convertible debentures to common stocks.[6] None of these transactions would have been possible had Coeur's stock price not been inflated based on the Coeur defendants' allegedly

6. Because the Court finds that the totality of the allegations permit a strong inference of the required state of mind, it need not, and does not,

determine if these prescribed motives are alone sufficient to raise such an inference.

misleading representations regarding Golden Cross, Fachinal, and the positive effect of those facilities on Coeur's financial status in general.

Furthermore, and contrary to Coeur's argument, these allegations do more than make general charges of "fraud by hindsight." For example, Plaintiffs allege that on April 15, 1996, Coeur officials met with Cyprus AMAX attorneys and reached an agreement to toll the statute of limitations for 60 days for claims arising out of Coeur's 1993 purchase from Cyprus of Golden Cross. The agreement was extended for 30 days just prior to its scheduled June 15 expiration. Yet only a few days after Coeur obtained the extension, Wheeler stated publicly that Coeur had strengthened its balance sheet and increased the resource estimate at Golden Cross. A few days after that, however, Coeur informed Cyprus it had already spent $15 million in an attempt to control the ground movement problem at Golden Cross. Only two weeks later Coeur wrote off the entire $53 million investment in Golden Cross. These and Plaintiffs' other particularized allegations raise a strong inference that the Coeur defendants actually knew their forward-looking statements regarding Coeur's expected performance and Golden Cross's and Fachinal's projected production levels were false at the time they made them and that their non-forward looking statements, such as those in Coeur's financial statements, were at the least made with extreme recklessness. The Court therefore will not dismiss the action against the Coeur defendants at this time. See Epstein, 993 F.Supp. at 1326–27; Gross, 977 F.Supp. at 1472; OnBank & Trust Co. v. F.D.I.C., 967 F.Supp. 81, 88–89 (W.D.N.Y.1997); Fugman, 961 F.Supp. at 1195; Norwood Venture Corp., 959 F.Supp. at 209; Friedberg, 959 F.Supp. at 50.

#### (iv) Ernst & Young

■ In contrast to the quantum of facts set forth with respect to the Coeur defendants, the few, sparse allegations regarding E & Y do not raise a strong inference of either knowing misbehavior or the type of recklessness necessary to impose liability. As briefly alluded to before, Plaintiffs' allegations amount to the following: (1) E & Y participated in the fraudulent scheme to keep Coeur as a client and ensure a continuous flow of substantial fees from Coeur; (2) E & Y had access to Coeur's confidential corporate and business information and therefore must have known that (a) Coeur had paid double other bidders for its interest in Golden Cross; (b) a Coeur director resigned in 1993 regarding the Golden Cross acquisition; (c) Coeur spent millions of dollars on remedial measures at Golden Cross; and (d) Golden Cross was one of Coeur's most vital assets; and (3) E & Y must have violated GAAP and GAAS because it "knew" of Coeur's misrepresentations and failed to account for or require their disclosure.

The first allegation—that E & Y committed fraud to retain Coeur as a client and ensure the continued receipt of Coeur's accounting and auditing fees—is absurd and disregarded in its entirety. Numerous courts have held, even before the Reform Act, that receipt of professional fees is not sufficient to raise a strong inference that an accounting firm committed fraud. See, e.g., In re Worlds of Wonder Securities Litigation, 35 F.3d 1407, 1427 n. 7 (9th Cir.1994) (describing this argument as "utterly without merit"); DiLeo v. Ernst & Young, 901 F.2d 624, 629 (7th Cir.1990); In re Health Management, 970 F.Supp. at 192; Zucker, 963 F.Supp. at 308 ("[M]ere receipt of compensation and the maintenance of a profitable business relationship does not constitute a sufficient motive for purposes of pleading scienter.").

It is equally implausible to assert that because an accountant had access to a company's internal data, it by implication was aware of any fraudulent scheme, no matter how far-reaching. Such a broad based rule would, as other courts have noted, subject any accountant or high-ranking company official to liability for even the most obscure allegation of fraud. See Zucker, 963 F.Supp. at 305; see also Vladimir v. Deloitte & Touche, LLP, No. 95–CV–10319, 1997 WL 151330, at *7 (S.D.N.Y.1997).

The specific charges in allegation 2, which all baldly claim that E & Y knew certain things, are exactly the type of rote conclusory allegations of scienter the Reform Act

sought to preclude. As described above, the Reform Act abrogated Rule 9(b)'s authorization to aver state of mind generally in favor of a more strict pleading standard requiring that the particular facts pled must themselves permit a strong inference of the required state of mind. A strong inference may not be drawn merely by asserting without elaboration that a particular defendant knew the very thing the plaintiff is trying to establish that the defendant knew.[7] *See Shields v. Citytrust Bancorp, Inc.*, 25 F.3d 1124, 1129 (2d Cir.1994) (pleading techniques which couple a factual statement with a conclusory allegation of fraudulent intent are so broad and conclusory as to be meaningless). Such vague and assumptive allegations were routinely rejected by courts even before the Reform Act was passed, and are rejected by this Court as well. *See Lovelace v. Software Spectrum, Inc.*, 78 F.3d 1015, 1019 (5th Cir. 1996) (inference of fraud not supported by "rote conclusory allegations that the defendants 'knowingly did this' or 'recklessly did that'"); *Shields*, 25 F.3d at 1129; *Greenstone v. Cambex Corp.*, 975 F.2d 22, 25 (1st Cir.1992) ("The courts have uniformly held inadequate a complaint's general averment of the defendant's 'knowledge' of material falsity, unless the complaint *also* sets forth specific facts that make it reasonable to believe that defendant knew that a statement was materially false or misleading.").

Plaintiffs' final allegation against E & Y—that the firm committed numerous GAAP and GAAS violations—suffers from the same deficiency. Plaintiffs merely recite a specific standard, and then assert, generally without much elaboration, that E & Y knowingly violated that standard. And when Plaintiffs do augment their assertions, they do so based on E & Y's assumed "knowledge" of the additional conclusory allegations discussed immediately above. In short, Plaintiffs try to bootstrap a strong inference of scienter by basing their allegations of GAAP and GAAS violations on a separate series of conclusory allegations, none of which permits any inference, let alone a strong one, that E & Y knew or recklessly disregarded the particular fact alleged.

Moreover, there is substantial authority that without additional allegations of particular facts and circumstances violations of GAAP and GAAS generally do not give rise to an inference of scienter. One court has explained this predominant position as follows: "[G]eneral allegations of GAAP and GAAS violations fail to satisfy the scienter requirements of Section 10(b) and Rule 10b-5. The mere misapplication of accounting principles by an independent auditor does not establish scienter. Rather, [a plaintiff] must prove that the accounting practices were so deficient that the audit amounted to no audit at all or that no reasonable accountant would have made the same decisions if confronted with the same facts." *Zucker*, 963 F.Supp. at 307–08; *see Rehm*, 954 F.Supp. at 1255 (allegations of a serious departure from GAAP are not by themselves sufficient to give rise to an inference of scienter); *The Limited, Inc. v. McCrory Corp.*, 645 F.Supp. 1038, 1045 (S.D.N.Y.1986) ("An inference of fraud does not arise from the mere fact that an auditor 'certified' an inaccurate financial statement.").

In sum, none of the allegations against E & Y, when considered separately or as a whole, are sufficient to raise a strong inference that E & Y acted with the required state of mind. Dismissal is therefore appropriate.

### D. Related Matters

Like Defendants, the Court is troubled by the fact that many of Plaintiffs' allegations appear to be nothing more than conveniently altered regurgitations of allegations in a separate complaint—filed in an unrelated action—by Coeur against Cyprus AMAX. In that case, Coeur sued Cyprus alleging Cyprus failed to disclose numerous, material, and specific problems at Golden Cross when it sold the mine to Coeur. In this action, the Coeur defendants argue that Plaintiffs have taken the Coeur–Cyprus complaint and asserted Coeur was aware of the very problems

---

**7.** It is this critical distinction that separates the Coeur allegations from the Ernst and Young allegations. Although some of the Coeur allegations are equally conclusory, others allege specific facts that independently raise a strong inference that the Coeur defendants acted with the required state of mind.

it claims to have been unaware of in the Cyprus complaint. Notwithstanding these circumstances, at this stage the Plaintiffs need only with sufficient specificity and particularity plead facts, which if true, state a viable claim. Plaintiffs need not prove their claims on a motion to dismiss. The Court warns Plaintiffs, however, that if by the close of discovery they have produced little or no evidence to support their claims, particularly those specific allegations taken from the Coeur–Cyprus complaint, not only will their claims be dismissed on motion for summary judgment but they shall bear *all* reasonable attorneys' fees, costs, and other expenses incurred by the Coeur defendants in defending this lawsuit.

### Conclusion

Based on the foregoing, the Court **OR-DERS** that Defendants Coeur D'Alene Mines Corporation's, Dennis A. Wheeler's, James A. Sabala's, and Ernst & Young's Motions to Transfer are **DENIED**; that Defendants Coeur D'Alene Mines Corporation's, Dennis A. Wheeler's, and James A. Sabala's Motion to Dismiss is **DENIED**; and that Defendant Ernst & Young's Motion to Dismiss is **GRANTED**. Because it appears from the pleadings and the argument before the Court that Plaintiffs can set forth no set of facts sufficient to withstand a motion to dismiss, Plaintiffs' claims against Ernst and Young are dismissed with prejudice, and therefore without leave to amend.