**CHERRY CREEK CARD & PARTY SHOP, INC., a Colorado corporation, Plaintiff,**

v.

**HALLMARK MARKETING CORPORATION, a Delaware corporation, Hallmark Real Estate Holdings, Inc., a Delaware corporation, and Hallmark Specialty Retail Group, Inc., a Delaware corporation, Defendants.**

**No. CIV.A. 01–B–1432.**

United States District Court, D. Colorado.

Dec. 24, 2001.

Keith D. Tooley, Welborn Sullivan Meck & Tooley, P.C., Denver, CO, for plaintiff.

Gale Timothy Miller, Geoffrey Harrison Simon, Davis, Graham & Stubbs LLP, United States District Court, Denver, CO, for defendants.

## MEMORANDUM OPINION AND ORDER

BABCOCK, Chief Judge.

Plaintiff Cherry Creek Card & Party Shop, Inc. ("Cherry Creek") brings claims for misappropriation of trade secrets, breach of contract, breach of the implied covenant of good faith and fair dealing, and misrepresentation/concealment against Defendants Hallmark Marketing Corporation, Hallmark Real Estate Holdings, Inc., and Hallmark Specialty Retail Group, Inc. (collectively "Hallmark"). Hallmark moves to dismiss or to stay pending arbitration. The motion is adequately briefed and oral argument was held on December 21, 2001. For the reasons set forth below, I deny Hallmark's motion. Jurisdiction is proper pursuant to 28 U.S.C. § 1332.

## I. Facts and Procedural History

The following facts are alleged in the Plaintiff's Amended Complaint and asserted in its Response to Motion to Dismiss or Stay. Cherry Creek, a Colorado corporation, is owned by the Burton family. Shares are owned by Gerald and Kathryn Burton, as well as their son "Brooke" Burton. Cherry Creek sells Hallmark cards, gifts, and specialty items. Although Cherry Creek is not a franchisee of Hallmark, it cannot sell Hallmark products without the agreement of Hallmark, and has signed a series of contracts covering those sales. For its first 25 years, the store was located at First Avenue and University in Cherry Creek.

When the Taubman Company purchased the area that is now the Cherry Creek Mall for redevelopment, Cherry Creek sought to relocate inside the Mall. Hallmark, however, refused to approve the move. As a result, Cherry Creek relocated to 6th and Fillmore instead. It asserts that it survived the move in large part due to the loyalty of its customers. Five years later, Cherry Creek again tried to locate inside the mall, and was again informed by Hallmark that Hallmark would not allow sales of its products inside the Mall. As a result, Cherry Creek did not relocate.

In 1997, Brooke Burton and his wife Karen formed Burton Enterprises, Inc. Burton Enterprises is a holding company for Burton EnterprisesArvada, LLC and Burton EnterprisesNorthglenn, LLC. Burton EnterprisesArvada, LLC operates a Hallmark store in Arvada, Colorado, opened in 1997. Burton EnterprisesNorthglenn operates a Hallmark store in Northglenn, Colorado, opened in 2000. Cherry Creek alleges that it made monetary loans to these two stores on the

strength of the business in its Cherry Creek location.

Since 1995 a "Point–of–Sales" ("POS") system has been in place in Cherry Creek's store. The system provides confidential financial, sales, and proprietary information on the store. This information is available to Hallmark, and allows Hallmark to support the store and assist with product planning. The POS system is governed by the February 22, 2000 POS Account Agreement.

In May 2000, Hallmark informed Cherry Creek that it was opening a new Hallmark store between Second and Third Avenues on University Boulevard, across the street from the original Cherry Creek store and within walking distance of the new Cherry Creek store. Cherry Creek alleges that Hallmark utilized the proprietary financial and sales information contained in the POS system to decide whether and where to place the competing store, as well as the products to place in that store. The May announcement came after Cherry Creek had already placed merchandise orders and made other commitments for the holiday season. The new store opened in time to compete with Cherry Creek during the critical Christmas season, and lured away many of Cherry Creek's customers. As a result, Cherry Creek has suffered significant financial losses.

## II. Jurisdiction

As an initial matter I address jurisdiction. Cherry Creek originally brought suit in Denver District Court. Hallmark removed the case, and there has been no motion to remand. The parties are admittedly diverse, with the exception of Cherry Creek and Hallmark Real Estate Holdings, Inc., which both have principal places of business in Colorado. *See* 28 U.S.C. § 1332(c)(1). Hallmark argues, however, that Hallmark Real Estate Holdings was mistakenly joined in the action. Once dismissed, diversity jurisdiction will exist.

Cherry Creek agrees, and moved at oral argument to dismiss Hallmark Real Estate Holdings as a Defendant. I grant that motion and dismiss Hallmark Real Estate Holdings with prejudice.

## III. Motion to Dismiss or Stay Pending Arbitration

Hallmark moves pursuant to Fed. R.Civ.P. 12(b)(1) to dismiss, or in the alternative to stay the case, pending arbitration. Hallmark argues that Burton EnterprisesArvada and Burton EnterprisesNorthglenn signed contracts with mandatory arbitration clauses and, thus, this case should be arbitrated as well.

### A. Fed.R.Civ.P. 12(b)(1) Standard

Rule 12(b)(1) empowers a court to dismiss a complaint for "lack of jurisdiction over the subject matter." Fed. R.Civ.P. 12(b)(1). As courts of limited jurisdiction, federal courts may only adjudicate cases that the Constitution and Congress have granted them authority to hear. *See* U.S. CONST. art. III, § 2; *Morris v. City of Hobart,* 39 F.3d 1105, 1110 (10th Cir.1994). Statutes conferring jurisdiction on federal courts are to be strictly construed. *See F & S Constr. Co. v. Jensen,* 337 F.2d 160, 161 (10th Cir.1964). A Rule 12(b)(1) motion to dismiss "must be determined from the allegations of fact in the complaint, without regard to mere conclusionary allegations of jurisdiction." *Groundhog v. Keeler,* 442 F.2d 674, 677 (10th Cir.1971). The burden of establishing subject matter jurisdiction is on the party asserting jurisdiction. *See Basso v. Utah Power & Light Co.,* 495 F.2d 906, 909 (10th Cir.1974).

Motions to dismiss pursuant to Rule 12(b)(1) may take two forms. First, if a party attacks the facial sufficiency of the complaint, the court must accept the allegations of the complaint as true. *See Holt v. United States,* 46 F.3d 1000, 1002–

03 (10th Cir.1995). Second, if a party attacks the factual assertions regarding subject matter jurisdiction through affidavits and other documents, the court may make its own findings of fact. *See id.* at 1003. A court's consideration of evidence outside the pleadings will not convert the motion to dismiss to a motion for summary judgment under Rule 56. *See id.* Here, Hallmark attacks the factual assertions regarding subject matter jurisdiction and both parties provide evidence. I therefore make findings of fact without converting the Motion to one for summary judgment.

*B. Federal Arbitration Act*

 There is a strong federal policy favoring arbitration for dispute resolution, and this policy "requires a liberal reading of arbitration agreements." *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.,* 460 U.S. 1, 23 n. 27, 103 S.Ct. 927, 74 L.Ed.2d 765 (1983). This means that any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration. *See id.* at 24–25, 103 S.Ct. 927; *Coors Brewing Co. v. Molson Breweries,* 51 F.3d 1511, 1514 (10th Cir.1995) ("All doubts are to be resolved in favor of arbitrability") (citations and quotations omitted). District courts must defer to arbitration "unless it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute. Doubts should be resolved in favor of coverage." *United Steelworkers of Am. v. Warrior & Gulf Navigation Co.,* 363 U.S. 574, 582–583, 80 S.Ct. 1347, 4 L.Ed.2d 1409 (1960) (citations omitted). *See also Fuller v. Pep Boys– Manny, Moe & Jack of Delaware, Inc.,* 88 F.Supp.2d 1158 (D.Colo.2000). The Federal Arbitration Act, 9 U.S.C. § 1, *et seq.* ("FAA") codifies a strong federal policy favoring the enforcement of arbitration agreements. Sections 3 and 4 of the FAA permit a Court to compel arbitration when one party has failed or refused to comply with an arbitration agreement. Neither party disputes that the FAA controls this case.

Although generally a non-signatory to an arbitration agreement cannot be forced to arbitrate claims, *see AT & T Tech., Inc. v. Communications Workers of Am.,* 475 U.S. 643, 649, 106 S.Ct. 1415, 89 L.Ed.2d 648 (1986) there are exceptions to this rule. *See, e.g., Employers Ins. of Wausau v. Bright Metal Specialties, Inc.,* 251 F.3d 1316, 1322–23 (11th Cir.2001) ( non-signatories may be bound to the arbitration agreements of others under common law principles of contract and agency law including incorporation by reference, assumption, agency, veil-piercing/alter ego, and estoppel); *Long v. Silver,* 248 F.3d 309, 319–20 (4th Cir.), *cert. denied,* —— U.S. ——, 122 S.Ct. 213, —— L.Ed.2d —— (2001) (a non-signatory may invoke an arbitration clause under ordinary state-law principles of agency or contract); *MS Dealer Serv. Corp. v. Franklin,* 177 F.3d 942, 946–47 (11th Cir.1999) (a non-signatory may enforce an arbitration agreement under a third-party beneficiary theory when the parties to the agreement have agreed, upon the formation of their agreement, to confer the benefits thereof to the non-signatory); *Gibson v. Wal–Mart Stores, Inc.,* 181 F.3d 1163, 1170 n. 3 (10th Cir.1999) (arbitration agreement may be enforced against third-party beneficiary of contract); *ARW Exploration Corp. v. Aguirre,* 45 F.3d 1455, 1460–61 (10th Cir. 1995) (non-signatory may be bound by a contract containing an arbitration clause upon a determination that the nonsignatory is the alter ego of a signatory); *O'Connor v. R.F. Lafferty & Co.,* 965 F.2d 893, 901 (10th Cir.1992) (arbitration agreement may be enforced against third-party beneficiary of contract); *Arnold v. Arnold Corp.–Printed Communications for Bus.,* 920 F.2d 1269, 1281 (6th Cir.1990) (citing cases from several circuits for the proposi-

tion that non-signatories of arbitration agreements may be bound by such agreements under ordinary contract and agency principles); *Fried, Krupp, GmbH, Krupp Reederei Und Brennstoff–Handel–Seeschiffarht v. Solidarity Carriers, Inc.*, 674 F.Supp. 1022, 1027 (S.D.N.Y.) (allowing party to assert non-signatory subsidiary's claim where party has "potential indemnification obligations" to that non-signatory), *aff'd without opinion*, 838 F.2d 1202 (2d Cir.1987).

The two arbitration agreements signed by Burton EnterprisesArvada and Burton EnterprisesNorthglenn read in pertinent part as follows: "Any controversy or claim arising out of or relating to this Agreement, or the breach thereof, or any aspects of the relationship between Hallmark and Retailer, or the termination thereof, shall be settled by binding arbitration under the United States Arbitration Act . . . ." Hallmark's Exhibit B at ¶ 10; Exhibit E at ¶ 10a. The Arvada agreement identifies the "retailer" as "Burton Enterprises Inc.". Hallmark's Exhibit B at 1. The Northglenn agreement identifies the "retailer" as "Burton EnterprisesNorthglenn, LLC, a Limited Liability Company." Hallmark's Exhibit E at 1.

Although Hallmark recognizes that Cherry Creek was not a signatory to either of the arbitration agreements, it argues that Cherry Creek should be required to arbitrate its claims because the Burtons have ignored the corporate form and equitable estoppel applies. I consider each argument in turn.

### C. Piercing the Corporate Veil

Hallmark first argues that because the Amended Complaint repeatedly refers to "the Burtons" rather than to the individual corporate entities, the Burtons have ignored the corporate form. It therefore argues that I should pierce the corporate veil and treat the agreements of two entities as the agreement of Cherry Creek. I disagree.

The corporate structure is an artificial construct of the law, a substantial purpose of which is to create an incentive for investment by limiting exposure to personal liability. "The insulation of a stockholder from the debts and obligations of his corporation is the norm, not the exception." *NLRB v. Deena Artware, Inc.*, 361 U.S. 398, 402–03, 80 S.Ct. 441, 4 L.Ed.2d 400 (1960) (citations omitted). In extreme circumstances the corporate form will be disregarded. However, the corporate veil should be pierced only reluctantly and cautiously. *See Cascade Energy & Metals Corp. v. Banks*, 896 F.2d 1557, 1576 (10th Cir.), *cert. denied*, 498 U.S. 849, 111 S.Ct. 138, 112 L.Ed.2d 105 (1990). Piercing the corporate veil is equitable in nature and as such is reserved for situations where some impropriety or injustice is evident.

Under traditional alter ego analysis, the corporate veil may be pierced if the individual and the corporation were alter egos of one another. The Tenth Circuit subscribes to a twopart analysis: (1) "was there such unity of interest and lack of respect given to the separate identity of the corporation by its shareholders that the personalities and assets of the corporation and the individual are indistinct[; and (2) ] would adherence to the corporate fiction sanction a fraud, promote injustice, or lead to an evasion of legal obligations." *N.L.R.B. v. Greater Kan. City Roofing*, 2 F.3d 1047, 1052 (10th Cir.1993) (citations omitted); *F.D.I.C. v. Oldenburg*, 34 F.3d 1529, 1555 (10th Cir.1994); *Frank v. U.S. West, Inc.*, 3 F.3d 1357, 1362 n. 2 (10th Cir.1993).

### 1. Unity of Interest

The "separate corporate identity" or "unity of interest" prong is meant to determine whether the stockholder and

the corporation have maintained separate identities. *See id.* "In determining whether the personalities and assets of the corporation and the stockholders have been blurred [the Court must] consider (i) the degree to which the corporate legal formalities have been maintained, and (ii) the degree to which individual and corporate assets and affairs have been commingled." *Greater Kan. City Roofing,* 2 F.3d at 1052. Among the specific factors considered in determining whether the corporation and its stockholders have maintained their separate identities are: (1) whether a corporation is operated as a separate entity; (2) commingling of funds and other assets; (3) failure to maintain adequate corporate records or minutes; (4) the nature of the corporation's ownership and control; (5) absence of corporate assets and undercapitalization; (6) use of a corporation as a mere shell, instrumentality or conduit of an individual or another corporation; (7) disregard of legal formalities and the failure to maintain an arms-length relationship among related entities; and (8) diversion of the corporation's funds or assets to noncorporate uses. *See id.* at 1052 n. 6. (citing *United States v. Van Diviner,* 822 F.2d 960, 965 (10th Cir.1987)).

### 2. Fraud or Injustice

Under the fraud, injustice, or evasion of obligations prong of the test the court must ask whether there is adequate justification to invoke the equitable power of the court. The Tenth Circuit "require[s] an element of unfairness, injustice, fraud, or other inequitable conduct as a prerequisite to piercing the corporate veil." *Id.; F.D.I.C. v. Oldenburg,* 34 F.3d 1529, 1555 (10th Cir.1994). The showing of inequity must flow from the misuse of the corporate form. "The mere fact that a corporation commits an unfair labor practice, or breaches a contract, or commits a tort, does not mean that the individual shareholders of the corporation should personally be liable... It is only when the shareholders disregard the separateness of the corporate identity *and when that act of disregard causes the injustice or inequity or constitutes the fraud* that the corporate veil may be pierced." *Greater Kan. City Roofing,* 2 F.3d at 1053.

Here, there is no evidence that the corporate form has been ignored in any way. Cherry Creek is a closely-held corporation, with Gerald, Kathryn, and Brooke Burton as its sole officers and shareholders. Although, the Amended Complaint at times refers to "the Burtons" rather than to Cherry Creek's proper corporate form, it clearly identifies Cherry Creek as a corporate plaintiff. Cherry Creek provides affidavits averring that the corporate structure of the four distinct entities has been scrupulously followed. *See* Plaintiff's Exhibits 1, 2. A close and fair reading of the Complaint makes clear that all claims are brought on behalf of Cherry Creek, and all damages alleged are those of Cherry Creek alone. Hallmark provides no countervailing evidence, except to point to the language in the Complaint. Further, Hallmark admits that no fraud has occurred, and provides no evidence of injustice. Hallmark has therefore failed to carry its burden to show that the corporate form should be ignored.

### D. Equitable Estoppel

Hallmark next argues that Cherry Creek should be required to arbitrate its claims under the doctrine of equitable estoppel. I again disagree.

In general, only parties to an agreement containing an arbitration provision can compel or be subject to arbitration. *See GATX Mgmt. Servs., LLC v. Weakland,* 171 F.Supp.2d 1159 (D.Colo. 2001). However, a nonparty may fall within the scope of an arbitration agreement. *See id.* (citations omitted). As the Second

Circuit explained, there are two theories of equitable estoppel in the arbitration context. First, courts have held non-signatories to an arbitration clause when the non-signatory knowingly exploits the agreement containing the arbitration clause despite having never signed the agreement. *See Thomson–CSF, S.A. v. Am. Arbitration Ass'n*, 64 F.3d 773, 778 (2d Cir.1995). Second, courts have bound a signatory to arbitrate with a nonsignatory "at the non-signatory's insistence because of 'the close relationship between the entities involved, as well as the relationship of the alleged wrongs to the nonsignatory's obligations and duties in the contract . . . and [the fact that] the claims were intimately founded in and intertwined with the underlying contract obligations.'" *Id.* at 779 (internal quotation marks omitted) (quoting *Sunkist Soft Drinks, Inc. v. Sunkist Growers, Inc.*, 10 F.3d 753, 757 (11th Cir.1993)) (quoting *McBro Planning & Dev. Co. v. Triangle Elec. Const. Co.*, 741 F.2d 342, 344 (11th Cir.1984)).

Under the first theory, courts prevent a non-signatory from embracing a contract, and then turning its back on the portions of the contract, such as an arbitration clause, that it finds distasteful. *See, e.g., Am. Bureau of Shipping v. Tencara Shipyard S.P.A.*, 170 F.3d 349, 353 (2d Cir. 1999) (non-signatory bound by contract under which it received the direct benefits of lower insurance and the ability to sail under the French flag); *Thomson–CSF, S.A.*, 64 F.3d at 779 (finding only indirect benefit insufficient to invoke equitable estoppel against a non-signatory). "In the arbitration context, the doctrine recognizes that a party may be estopped from asserting that the lack of his signature on a written contract precludes enforcement of the contract's arbitration clause when he has consistently maintained that other provisions of the same contract should be enforced to benefit him. 'To allow [a plaintiff] to claim the benefit of the contract and simultaneously avoid its burdens would both disregard equity and contravene the purposes underlying enactment of the Arbitration Act.'" *Int'l Paper Co. v. Schwabedissen Maschinen & Anlagen GMBH*, 206 F.3d 411, 418 (4th Cir.2000) (internal citation omitted); *Long v. Silver*, 248 F.3d 309, 319–20 (4th Cir.2001) (requiring arbitration in suit brought by non-signatory shareholders, finding that any other conclusion would render the contract and arbitration agreement meaningless and thwart the federal policy in favor of arbitration); *Am. Bureau of Shipping v. Tencara Shipyard S.P.A.*, 170 F.3d 349, 353 (2d Cir.1999); *Smith/Enron Cogeneration Ltd. P'ship, Inc. v. Smith Cogeneration Int'l, Inc.*, 198 F.3d 88 (2d Cir.1999), *cert. denied*, 531 U.S. 815, 121 S.Ct. 51, 148 L.Ed.2d 20 (2000) (signatory to arbitration agreement was estopped from avoiding arbitration with non-signatories, where signatory treated non-signatories and affiliated signatories as single unit in its complaint); *Deloitte Noraudit A/S v. Deloitte Haskins & Sells, U.S.*, 9 F.3d 1060, 1064 (2d Cir.1993); *Sam Reisfeld & Son Import Co. v. S.A. Eteco*, 530 F.2d 679, 681 (5th Cir.1976) (finding that one cannot seek a benefit under a contract while "simultaneously attempting to avoid the terms of an arbitration provision contained therein.").

Further, application of equitable estoppel is warranted when the signatory to the contract containing an arbitration clause raises allegations of substantially interdependent and concerted misconduct by both the nonsignatory and one or more of the signatories to the contract. Otherwise the arbitration proceedings between the two signatories would be rendered meaningless and the federal policy in favor of arbitration effectively thwarted. *See MS Dealer Serv. Corp. v. Franklin*, 177 F.3d 942, 947 (11th Cir.1999); *McBro Planning and Dev. Co. v. Triangle Elec. Constr. Co., Inc.*,

741 F.2d 342, 344 (11th Cir.1984) (nonsignatory to contract containing arbitration clause was bound by signatory to arbitrate dispute where claims were inextricably intertwined with duties created in underlying contract and non-signatory signed a related contract which contained an arbitration clause).

■ Hallmark notes that the Complaint seeks damages based on financial commitments made by Cherry Creek prior to the opening of the competing Hallmark store. A portion of these damages were allegedly caused by Cherry Creek's decision to financially support the Arvada and Northglenn companies on the assumption that Cherry Creek would remain economically viable. Hallmark argues that the claims are therefore intertwined with the Arvada and Northglenn contracts, each of which require arbitration. Cherry Creek, however, explains its claims as follows:

(1) Misappropriation of trade secrets— Cherry Creek alleges that Hallmark accessed trade secrets through the POS system and wrongly used those trade secrets in formulating the competing store.

(2) Breach of contract—Cherry Creek alleges that Hallmark breached the POS agreement by using confidential information from the POS system to open the competing store.

(3) Breach of the implied covenant of good faith and fair dealing—Cherry Creek alleges that it entered into numerous contracts with Hallmark, including the POS agreement, each of which included an implied covenant of good faith and fair dealing. It alleges that Hallmark breached those covenants by: (a) using confidential trade secret information to open a competing store; (b) encouraging Cherry Creek to place merchandise orders without disclosing the competition; (c) withholding information regarding the competing store when it knew that Cherry Creek was making financial commitments and loans based on the anticipated strength of its business; and (d) discussing leasing matters with Cherry Creek without disclosing that a competing store would be opening a few blocks away.

(4) Misrepresentation/ Concealment— Cherry Creek alleges that Hallmark encouraged it to loan money to other businesses without disclosing the competing store. Cherry Creek alleges that it would not have made these loans had it known that a competing store would soon open nearby.

Although these claims reference the Arvada and Northglenn companies, they do not make claims or seek damages on behalf of those entities. Rather, Cherry Creek alleges that it made financial commitments based on the belief that its business would remain strong. These commitments included loans to Burton EnterprisesArvada, LLC and Burton EnterprisesNorthglenn, LLC. However, Cherry Creek alleges that the loans were from one corporate entity to another, and Hallmark provides no evidence to the contrary. Hallmark fails to justify the application of the doctrine of equitable estoppel under any theory. *See GATX Mgmt. Servs., LLC v. Weakland,* 171 F.Supp.2d 1159 (D.Colo.2001) (allowing a non-signatory of an employment agreement to compel arbitration of claims under an equitable estoppel theory).

Accordingly, IT IS ORDERED that:

1. Defendant Hallmark Real Estate Holdings is DISMISSED WITH PREJUDICE; and

2. Defendants' motion to dismiss or stay pending arbitration is DENIED.